615 A.2d 1190

Timothy ROBINSON

v.

Deborah ROBINSON.

No. 34, Sept. Term, 1992.

Court of Appeals of Maryland.

Dec. 8, 1992.

Joel Marc Abramson, (Harry B. Siegel, The Law Offices of Joel Marc Abramson, both on brief), Columbia, for appellant.

Lary Cook Larson (Charles Martinez, Eccleston and Wolf, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

We issued a writ of certiorari in this case to consider the following questions: whether under the circumstances the

trial judge properly permitted a defendant in a child custody proceeding, who on cross-examination exercised her Fifth Amendment right against self-incrimination and refused to answer questions regarding her adultery, to testify as to her fitness to retain custody and to call others to do the same; what permissible inferences the court may draw from her silence; and the role adultery plays in the custody determination.

## I.

Timothy Robinson, the appellant, and Deborah Robinson, the appellee, were married on February 28, 1987, in Ellicott City, Maryland. Their only child, William James Robinson, was born on June 10, 1987. Except for a brief period after William's birth, both parties worked full-time pursuing their respective careers. Following a job change to Bell Atlantic Network Systems, Inc. in 1989, the appellee met Peter Johnson. Shortly thereafter, she and the appellant became dissatisfied with their marriage and, in January, 1990, they mutually agreed to separate. After finding an apartment, appellee moved out of the marital home on March 15, 1990.

From March 15, 1990, through October 8, 1990, the parties shared custody of William, who spent alternate weeks with each of them. A change in appellant's employment on the latter date required that he be away from home for extended periods during the week, and the parties agreed to change their custody arrangement for William. It was agreed that appellee would have custody of William during the week and one weekend each month with William staying with his father during three weekends each month. On June 20, 1991, appellee moved into a four bedroom house in Columbia which she rents jointly with her sister, Beth.

In October, 1990, appellee filed a complaint for limited divorce in the Circuit Court for Howard County, asserting the ground of mutual and voluntary separation. She also sought custody of William and child support from appellant. In his answer to the original complaint, appellant admitted

that the separation was mutual and voluntary and that appellee was fit to have custody of their child, but he asked the court to award the parties joint custody of William. On June 11, 1991, appellee filed a supplemental complaint for absolute divorce, based on the couple's one year voluntary separation. She also sought permanent custody of William and child support from appellant. Answering the supplemental complaint, appellant denied that he had voluntarily separated from his wife and that she was a fit and proper person to have custody of their son. He also filed a counter-complaint, seeking an absolute divorce on grounds of desertion and adultery, custody of William, and child support from appellee.

When the case was called for trial on September 3, 1991, before Judge James B. Dudley, the parties advised the court that appellant had no objection to the divorce being granted to appellee on the ground of mutual and voluntary separation and that the only contested issues were the custody of William and child support. After a two day trial, Judge Dudley granted appellee an absolute divorce on the ground of voluntary separation, awarded her custody of William, and ordered appellant to pay $746.00 monthly in child support.

During the proceedings, appellant's counsel cross-examined appellee on her relationship with Peter Johnson, whom she had not mentioned in her testimony on direct examination. She refused to answer the questions, exercising her privilege under the Fifth Amendment of the United States Constitution against self-incrimination. The trial court sustained her privilege as to those questions relating to the period after September 3, 1990. The judge required her to answer for her activities prior to September 3, 1990, because the statute of limitations, Maryland Code (1974, 1989 Repl. Vol.), § 5–106 of the Courts and Judicial Proceedings Article, barred any prosecution of her for the misdemeanor of adultery[1] which occurred more than one year earlier.

---

1. Md.Code (1957, 1992 Repl.Vol.) Article 27, § 4 provides:

She admitted that she had engaged in sexual relations with Peter Johnson prior to September 3, 1990. During appellee's testimony on redirect examination and later, during the testimony of appellee's sister and her mother, appellant's counsel objected to questions regarding appellee's fitness for custody of William based on her prior invocation of the Fifth Amendment privilege. The court overruled the objections. The court also denied appellant's motion to strike appellee's testimony on direct examination as to her fitness to have custody of her son.

In a memorandum supporting his decision, Judge Dudley wrote:

"The Court has considered and weighed all of the traditional considerations and factors in determining the best interests of the child and the fitness of each parent to have custody. In this case, each parent is a fit and proper person to be awarded custody. Each parent would provide something slightly different to the child as a custodian. Both parents have full-time jobs and both would rely upon professional day care providers during the work week.

"The husband alleged the child reported being in bed with his mother and her new boyfriend. The mother denies any such incident but admits that her boyfriend stays overnight with her frequently and sleeps with her in her bedroom. The four-year-old child is also exposed to his aunt and her live-in boyfriend's sleeping arrangement. The husband argues that this amoral atmosphere is not in the child's best interest and that it should tip the scale in favor of his getting custody. The moral standards were established by the parties before the marriage when this child was conceived. What effect the present sleeping arrangements have upon this child is unknown. What is known is that in this day and age, single parents

---

"Any person who shall commit adultery shall upon conviction thereof in any of the circuit courts for the counties of this State be fined ten dollars."

quickly find new friends and partners and the children in these cases are frequently being introduced to new adult friends of the custodial parent. There is no reason to believe non-custodial parents are any different. Learning to cope with new adults and the disrupting effects of visitation schedules are the unavoidable consequences of divorce. Also, the separation commonly requires the custodial parent to find new housing accommodations when their resources are minimal. This may result in accommodations that are less than ideal and possibly even less than the non-custodial parent could provide. That may be true in this case, but that alone is not enough to determine the best interest of the child.

"In this case, the husband is living in the former marital residence with a male tenant. The husband utilizes a day care provider and spends substantial amounts of time on the weekends with his son. There was no testimony or evidence that any other adults are involved in the husband's efforts to raise the child. The wife is residing with her twenty-seven-year-old unmarried sister in a townhouse they rent. The sister frequently shares in raising the child and the wife's parents live nearby and the wife and child visit there on a weekly basis. The existence and participation of these extended members of the family in the child rearing activities provides some stability and completeness for the child which is otherwise lacking. These regular contacts with the aunt and grandparents may help fill a void which would otherwise result from this divorce. This advantage outweighs the potential disadvantages of having the child residing with his mother and aunt while they search out new partners. Certainly, when the husband resumes courtship, he would be expected to share a great deal of time and to expose the child to a variety of new adult females. This, except for the moral consequences of the sleeping arrangements, is not significantly different from what he is experiencing now. The Court therefore finds that the advantages of custodial continuity, stability and of the frequent interac-

tion in an extended family create an advantage to custody with the wife. In this close case, that advantage tips the scale of the best interest of the child in favor of custody to the wife."

Appellant timely filed an appeal to the Court of Special Appeals from the judgment entered by the trial court. We issued a writ of certiorari prior to consideration of the case by the intermediate appellate court.

## II.

The standard for appellate review in child custody cases was clarified by this Court in *Davis v. Davis*, 280 Md. 119, 372 A.2d 231 (1977):

"In sum, we point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 [current Maryland Rule 8–131(c)] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion."

*Id.* at 125–126, 372 A.2d at 234 (footnote omitted).

This Court further explained the *Davis* rule in *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977):

"The teaching of *Davis v. Davis, supra,* is plain. The ultimate conclusion as to the custody of a child is within the sound discretion of the chancellor. That conclusion is neither bound by the strictures of the clearly erroneous rule, that rule applying only to factual findings of the chancellor in reaching the conclusion, nor is it a matter of the best judgment of the reviewing court. It is not enough that the appellate court find that the chancellor

was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion the chancellor exercised was clearly abused. This is the principle which controls the review of any matter within the sound discretion of a trial court as distinguished from a judgment falling squarely within the ambit of the clearly erroneous rule."

*Id.* at 186, 372 A.2d at 591. *See also Domingues v. Johnson,* 323 Md. 486, 492 n. 2, 593 A.2d 1133, 1136 n. 2 (1991); *McCready v. McCready,* 323 Md. 476, 484, 593 A.2d 1128, 1131–32 (1991); *In re Jessica M.,* 312 Md. 93, 110–11, 538 A.2d 305, 313–14 (1988); *Elza v. Elza,* 300 Md. 51, 55–56, 475 A.2d 1180, 1182 (1984); *Kemp v. Kemp,* 287 Md. 165, 170, 411 A.2d 1028, 1031 (1980).

### III.

The Fifth Amendment provides in part: "No person ... shall be compelled in any criminal proceeding to be a witness against himself." The privilege has its analogue in Art. 22 of the Maryland Declaration of Rights: "That no man ought to be compelled to give evidence against himself in a criminal case." The Maryland right is generally in *pari materia* with the federal privilege and has usually received a like construction. *Choi v. State,* 316 Md. 529, 535–36 n. 3, 560 A.2d 1108, 1111 n. 3 (1989); *Ellison v. State,* 310 Md. 244, 259–60 n. 4, 528 A.2d 1271, 1278–79 n. 4 (1987); *Richardson v. State,* 285 Md. 261, 265, 401 A.2d 1021, 1023–24 (1979); *Smith v. State,* 276 Md. 521, 526, 350 A.2d 628, 632 (1976); *State v. Panagoulis,* 253 Md. 699, 707 n. 3, 253 A.2d 877, 881 n. 3 (1969); *Brown v. State,* 233 Md. 288, 296, 196 A.2d 614, 617 (1964). Furthermore, the Fifth Amendment is applicable to the States by virtue of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

■ Although by the literal terms of the Fifth Amendment the self-incrimination privilege applies only to criminal proceedings, the privilege has been construed to extend to witnesses in civil litigation where the answer to interroga-

tion might tend to subject the witness to criminal prosecution. *Whitaker v. Prince George's County*, 307 Md. 368, 384–87, 514 A.2d 4, 12–15 (1986).

"Thus, in a civil case the fifth amendment does not preclude from disclosure facts which would tend to establish civil liability, but rather protects a witness from being required to make disclosure, otherwise compellable in the trial court's contempt power, which could incriminate him in a later criminal prosecution."

*Id.* at 385, 514 A.2d at 13. *See also Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *McCarthy v. Arndstein*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924); *Kramer v. Levitt*, 79 Md.App. 575, 582–89, 558 A.2d 760, 76–68, *cert. denied*, 317 Md. 510, 564 A.2d 1182 (1989); *Wigmore on Evidence* § 2254 (McNaughton rev. 1961).

In *Whitaker*, we held that once the privilege is invoked by a party who testifies in a civil case the refusal to answer the question cannot be used against the party in a subsequent criminal proceeding; however, the fact finder in the civil proceeding is entitled to draw an adverse inference against the party from that refusal to testify. *Id.* This same view was expressed in *Baxter v. Palmigiano, supra.* Speaking for the Supreme Court, Justice White wrote:

"Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*' 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)."

425 U.S. at 318, 96 S.Ct. at 1558, 47 L.Ed.2d at 821 (emphasis in original). Therefore, where a party in a civil proceeding invokes the Fifth Amendment privilege against self-incrimination in refusing to answer a question posed during

that party's testimony, the fact finder is permitted to draw an adverse inference from that refusal.[2]

 Appellant argues that since the privilege was invoked to avoid testimony as to her adultery, appellee should not be permitted to testify as to her fitness for custody, concluding that the commission of adultery and the unfitness for permanent custody are synonymous. We disagree with the argument and the premise on which it is based. As we explained in *Davis v. Davis*, 280 Md. at 127, 372 A.2d at 235, "whereas the fact of adultery may be a relevant consideration in child custody awards, no presumption of unfitness on the part of the adulterous parent arises from it; rather it should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare." Therefore, while the trial judge in the instant case properly drew the inference that the appellee was an adulteress from her invocation of her Fifth Amendment privilege in response to those questions on cross-examination pertaining to that conduct, the invocation of the constitutional privilege did not require the trial judge to strike the direct testimony of the defendant-witness with regard to the other factors bearing upon the issue of which custodial arrangement would serve William's best interest. Nor did appellee's invocation of the privilege bar her from calling other witnesses to support her claim that she should be granted custody.

 The appellant's suggested rule might work in civil actions where a complaining party refuses to answer defendant's questions and only the interests of the plaintiff and defendant are at stake.[3] Custody proceedings are different,

---

2. As we pointed out in *Whitaker v. Prince George's County*, 307 Md. at 386, 514 A.2d at 14, the adverse party's refusal, taken alone, does not relieve a party of his or her burden of proof on the issue which was the subject of the question.

3. Two schools of thought have emerged as courts have attempted to forge an appropriate remedy when a complaining party refuses to answer questions on cross-examination by invocation of the Fifth Amendment privilege against compelled self-incrimination.

The first school takes the position that by filing a civil suit, the party has automatically waived his Fifth Amendment privilege. Under this approach, where the complaining party refuses to participate in discovery or answer questions on cross-examination, that party's claim should be dismissed. This view has been adopted by a number of courts: *Afro–Lecon, Inc. v. United States,* 820 F.2d 1198 (Fed.Cir.1987) (party may not bring action, claim Fifth Amendment privilege, and proceed with action); *Lyons v. Johnson,* 415 F.2d 540 (9th Cir.1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970) ("The scales of justice would hardly remain equal in these respects, if a party can assert a claim against another then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim."), *but see Campbell v. Gerrans,* 592 F.2d 1054, 1057–58 (9th Cir.1979) (result limited to case where claim of privilege founded on groundless fear of prosecution); *Brown v. Ames,* 346 F.Supp. 1176 (D.Minn.1972) (plaintiffs can be compelled either to waive Fifth Amendment privilege or have action dismissed); *Independent Prods. Corp. v. Loew's Inc.,* 22 F.R.D. 266 (S.D.N.Y.1958) (plaintiffs waive whatever privilege they may have had by bringing action); *Pavlinko v. Yale–New Haven Hospital,* 192 Conn. 138, 470 A.2d 246 (1984) (plaintiff invoking privilege against self-incrimination risks having complaint dismissed); *Stockham v. Stockham,* 168 So.2d 320 (Fla.1964) (equity considerations require complaining spouse in divorce action to answer requests or pursue action no further); *Christenson v. Christenson,* 281 Minn. 507, 162 N.W.2d 194 (1968) (plaintiff required to waive privilege or have divorce action dismissed); *Franklin v. Franklin,* 365 Mo. 442, 283 S.W.2d 483 (1955) (complaining spouse's refusal to answer questions at support hearing justified striking of spouse's pleadings); *Levine v. Bornstein,* 13 Misc.2d 161, 174 N.Y.S.2d 574 (N.Y.Sup.Ct.), (plaintiff has right to invoke Fifth Amendment privilege, but not at detriment to defendant's ability to develop a defense), *aff'd,* 7 A.D.2d 995, 183 N.Y.S.2d 868 (1958), *aff'd,* 6 N.Y.2d 892, 190 N.Y.S.2d 702, 160 N.E.2d 921 (1959); *Annest v. Annest,* 49 Wash.2d 62, 298 P.2d 483 (1956) (court adopted rule that party seeking affirmative relief automatically waived privilege or subjected suit to dismissal, but noted that this was not an applicable rule for custody cases where issue turns on welfare of children not rights of parties).

A second school takes the position that the right of the plaintiff to exercise a constitutional privilege must be balanced with the defendant's need for disclosure. Where the defendant's need is substantial the court has provided that dismissal is only appropriate where less drastic sanctions, such as the drawing of an adverse inference or the striking of the plaintiff's direct testimony, are not available. *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, 1088 (5th Cir.1979) ("Therefore we emphasize that a civil plaintiff has no absolute right to both his silence and his lawsuit. Neither, however, does the civil defendant have an absolute right to have the action dismissed anytime a plaintiff invokes his constitutional privilege. When plaintiff's silence is constitutionally guaranteed, dismissal is appropriate only

however, in that although the rights and interests of the parents are a concern to the court, the court's overriding responsibility is to protect the best interests of the child or children in question. *Ross v. Hoffman,* 280 Md. 172, 174–175, 372 A.2d 582, 585 (1977). Because the court must consider various factors in order to arrive at a custody determination, harsh evidentiary sanctions which would result in excluding all the appellee's testimony *regarding* her fitness for custody would frustrate the primary purpose of the custody proceeding. This is not to say that no sanction will be applied when a complaining spouse seeking custody refuses to answer questions regarding her adultery. In the instant case, however, we limit that sanction to the permissible adverse inference against appellee and the bar to her testifying in defense of the adultery charge. This result enabled the trial court to inquire into its custody concerns, the appellee was permitted to exercise her constitutional privilege, and the appellant received the benefit of the inference that appellee had committed adultery, while still having the opportunity to present his own evidence of any

---

where other, less burdensome, remedies would be an ineffective means of preventing unfairness to defendant."); *Mahne v. Mahne,* 66 N.J. 53, 61, 328 A.2d 225, 229 (1974) ("Proper balances are the goal and trial courts must seek those sanctions which are best designed to protect the pertinent public and private interests without impairing the historic designs of the privilege."); *Pulawski v. Pulawski,* 463 A.2d 151, 157 (R.I.1983) ("When the court deals with private litigants, the privilege against self-incrimination must be weighed against the right of the other party to due process and a fair trial. The shield of the privilege must not be converted into a sword.").

*See also* Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege In Civil Cases,* 91 Yale L.J. 1062 (1982); Moxham, *A Comment Upon the Effect of Exercising One's Fifth Amendment Privilege In Civil Litigation,* 12 New Eng.L.Rev. 265 (1976); Commentary, *Penalizing the Civil Litigant Who Invokes the Privilege Against Self–Incrimination,* 24 U.Fla.L.Rev. 541 (1972); Note, *Toward a Rational Treatment of Plaintiffs Who Invoke the Privilege Against Self–Incrimination During Discovery,* 66 Iowa L.Rev. 575 (1981); Note, *Plaintiff as Deponent: Invoking the Fifth Amendment,* 48 U.Chi.L.Rev. 158 (1981); Note, *District Court Should Balance Threatened Harm to Constitutional Rights Against Requesting Party's Need of Information Privileged Under First and Fifth Amendments,* 27 Vill.L.Rev. 198 (1981).

damaging impact of the appellee's adultery on their child.[4]

## IV.

■ Finally, appellant argues that the trial court erred in granting sole custody of William to the appellee under facts and circumstances present in the case *sub judice*, in particular the appellee's adulterous relationship. The primary concern to a judge in awarding custody to one parent over the other is the best interests of the child. We have repeatedly stated the test originally set forth in *Hild v. Hild*, 221 Md. 349, 157 A.2d 442 (1960) as follows:

"For the purpose of ascertaining what is likely to be in the best interests and welfare of a child a court may properly consider, among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. It stands to reason that the fitness of a person to have custody is of vital importance. The paramount consideration, however, is the general overall well-being of the child."

*Id.* at 357, 157 A.2d at 446 (citation omitted). *See also Queen v. Queen*, 308 Md. 574, 587–88, 521 A.2d 320, 327 (1987); *Palmer v. Palmer*, 238 Md. 327, 331, 207 A.2d 481, 483 (1965); *Ferster v. Ferster*, 237 Md. 548, 550, 207 A.2d 96, 97–98 (1965); *Wallis v. Wallis*, 235 Md. 33, 36, 200 A.2d 164, 165 (1964); *Glick v. Glick*, 232 Md. 244, 248, 192 A.2d 791, 794 (1963).

Judge Dudley clearly considered these factors in reaching his decision that the best interests of William would be served by granting custody of him to his mother. Despite

---

**4.** It should be noted that the appellant never sought to introduce other evidence of his wife's adultery or the impact the alleged adultery had on the child.

his express finding that appellee was engaged in an adulterous relationship with Peter Johnson, he concluded that "[in] this case, each parent is a fit and proper person to be awarded custody." In reaching that conclusion, he relied on the following facts:

1. The appellee had been the primary caretaker of the child since his birth.

2. Since the separation of appellant and appellee, William had been in the custody of the appellee except for a brief period while the parties shared custody.

3. There was no indication that appellee's adulterous conduct had any adverse effect on her son.

4. William is a happy, healthy, well developed, normal child.

5. Appellee's sister, with whom she resides, and her parents, who live nearby participate in the child rearing activities which provides stability for William which otherwise would be lacking.

These findings of fact were supported by the evidence and therefore were not clearly erroneous. We hold that the trial court did not abuse its discretion in awarding custody of William to the appellee.[5]

JUDGMENT AFFIRMED, WITH COSTS.

---

**5.** Appellee has moved pursuant to Maryland Rule 1–341 for sanctions against the appellant, arguing that this appeal has been pursued without substantial justification. We find no merit in that argument and the motion is denied.