722 A.2d 73

Stephanie SCHAEFER

v.

Michael CUSACK.

No. 880, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Dec. 30, 1998.

Paul A. Dorf and Russell G. Alion, Jr. (F. Kirk Kolodner and Adelberg, Rudow, Dorf, Hendler & Sameth, L.L.C., on the brief), Baltimore, for Appellant.

Samuel Sperling and Rhonda I. Framm (Samuel Sperling and Sperling & Framm, on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and MOYLAN and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

MARVIN H. SMITH, Judge (Retired, Specially Assigned).

We have here a custody battle between Stephanie Schaefer (Stephanie) and Michael Cusack (Michael). It is on appeal from the Circuit Court for Baltimore City. Multiple issues were raised. Fortunately, several have been settled by stipulation since the appeal was filed. We shall discuss the issues *seriatim*, setting forth such facts as may be necessary for an

understanding of each issue. We shall affirm in part and reverse in part. Not only do we have multiple issues, but we have a motion to dismiss Stephanie's appeal and a motion to dismiss what Michael calls his "contingent cross-appeal".

## I.

## MOTION TO DISMISS THE APPEAL

■ Michael moves to dismiss the appeal arguing that "[a] claimant cannot accept the benefits of a trial judge or chancellor's ruling in a disputed case, and then later attack the validity of that ruling on appeal. *Suburban Dev. Corp. v. Perryman,* 281 Md. 168, 377 A.2d 1164 (1977)." He contends that here Stephanie "has taken the benefits of the trial judge's Orders" in each of the subjects of "custody and visitation/parental time," "child support", "monetary award", and "award of Attorneys fees." Oddly enough at no time did either party cite to us *Dietz v. Dietz,* 117 Md.App. 724, 701 A.2d 1144 (1997), *rev'd, Dietz v. Dietz, 351* Md. 683, 720 A.2d 298 (1998), where this Court dismissed an appeal seeking an increase in a monetary award because the appellant had accepted payments under the award as rendered. We deny this motion to dismiss on the basis of *Dietz.*[1]

## II.

## AWARD OF FUTURE CUSTODY

■ The parties were married on July 11, 1992, in Baltimore City. Their only child, the subject of this litigation, Garrett Michael Cusack (Garrett), was born September 15, 1993. The parties separated in April, 1994. The trial judge (Brynes, J.) ordered "that physical custody of the minor child Garrett is granted to the plaintiff until thirty days following his completion of the fifth grade. At that point in time, physical custody is awarded to Michael Cusack until Garrett's

---

1. We deliberately delayed our opinion in this case awaiting the decision of the Court of Appeals.

eighteenth birthday. . . ."  Stephanie contends that "the trial court abused its discretion in ordering an *in futuro* change in custody 30 days after Garrett completes fifth grade (approximately eight years from the date of the final judgment)".  We agree.

Stephanie relies upon *Sullivan v. Auslaender,* 12 Md.App. 1, 276 A.2d 698 (1971), asserting that there "this court determined that a separation agreement which contemplated an automatic change in custody in the future was not in the best interests of the children."  What she does not tell us, however, is that in that case the Court of Special Appeals substituted its judgment for that of the trial judge and that in *Davis v. Davis,* 280 Md. 119, 372 A.2d 231 (1977), Judge Digges said for the Court of Appeals:

> [T]here is some confusion in our cases with respect to the standard of review applicable to the chancellor's ultimate conclusion as to which party should be awarded custody. Notwithstanding some language in our opinions that this conclusion cannot be set aside unless clearly erroneous, *see, e.g., Spencer v. Spencer,* 258 Md. 281, 284, 265 A.2d 755, 756 (1970)(*per curiam); Goldschmiedt v. Goldschmiedt,* 258 Md. 22, 26, 265 A.2d .264, 266 (1970), we believe that, because such a conclusion technically is not a matter of fact, the clearly erroneous standard has no applicability.  However, we also repudiate the suggestion contained in some of our predecessors' opinions, *see, e.g., Melton v. Connolly,* 219 Md. 184, 188, 148 A.2d 387, 389 (1959); *Butler v. Perry,* 210 Md. 332, 339–40, 123 A.2d 453, 456 (1956); *Burns v. Bines,* 189 Md. 157, 164, 55 A.2d 487, 490 (1947); *cf. Ex Parte Frantum,* 214 Md. 100, 105, 133 A.2d 408, 411, *cert. denied,* 355 U.S., 882 [78 S.Ct. 149, 2 L.Ed.2d 112] (1957) (adoption case), and relied upon by the Court of Special Appeals in *Sullivan v. Auslaender,* 12 Md.App. 1, 3–5, 276 A.2d 698, 700–01 (1971), and its progeny, *see, e.g. Sartoph v. Sartoph,* 31 Md.App. 58, 64 & n. 1, 354 A.2d 467, 471 (1976); *Vernon v. Vernon,* 30 Md.App. 564, 566, 354 A.2d 222, 224 (1976), that appellate courts must exercise their "own sound judgment" in determining whether the conclusion of the chancel-

lor was the best one. Quite to the contrary, it is within the sound discretion of the chancellor to award custody according to the exigencies of each case, *Miller v. Miller*, 191 Md. 396, 407, 62 A.2d 293, 298 (1948), and as our decisions indicate, a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. *See, e.g., Pontorno v. Pontorno*, 257 Md. 576, 581, 263 A.2d 820, 822 (1970).

*Id.* at 124–125, 372 A.2d 231.

■ "The determination of which parent should be awarded custody of a minor child rests within the sound discretion of the trial court." *Giffin v. Crane*, 351 Md. 133, 144, 716 A.2d 1029 (1998), citing cases.

The parties in this case can agree on but little. They do agree that we apply the best interest standard and that the trial judge's determination stands absent an abuse of discretion.[2]

In *Ross v. Hoffman*, 280 Md. 172, 372 A.2d 582 (1977), Judge Orth said for the Court:

In performing its child protection function and its private-dispute settlement function the court is governed by what is in the best interests of the particular child and most conducive to his welfare. This best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance. In *Burns v. Bines*, 189 Md. 157, 162, 55 A.2d 487, 489 (1947), quoting *Barnard v. Godfrey*, 157 Md. 264, 267, 145 A. 614, 615 (1929), we observed that the statute

---

**2.** Apparently, the best interest standard was not observed in an earlier day. See, *Hild v. Hild*, 221 Md. 349, 157 A.2d 442, (1960), where Judge Horney said for the Court:

At the common law the father was generally entitled to the custody of his minor children, but in the absence of statutory requirements to the contrary, modern courts invariably hold that the best interests and welfare of the child should be primarily considered in making an award of custody. *Carter v. Carter*, 156 Md. 500, 144 A. 490 (1929). *Id.* at 357, 157 A.2d 442.

See also the discussion for this court by Chief Judge Gilbert in *Montgomery County v. Sanders*, 38 Md.App. 406, 412–417, 381 A.2d 1154 (1978).

giving equity courts jurisdiction over the custody of children 'is declaratory of the inherent power of courts of equity over minors, and [such jurisdiction] should be exercised with the paramount purpose in view of securing the welfare and promoting the best interest of the children.' We noted in *Dietrich v. Anderson,* 185 Md. 103, 117, 43 A.2d 186 (1945) that the statute has been so uniformly construed. We said in *Butler v. Perry,* 210 Md. 332, 342, 123 A.2d 453, 458 (1956): 'Of course, it is too elementary to be stressed that the welfare of the child is the controlling test in a custody case.'

*Id.* at 174–175, 372 A.2d 582.

More recently in *Robinson v. Robinson,* 328 Md. 507, 615 A.2d 1190 (1992), Judge Karwacki said for the Court:

The primary concern to a judge in awarding custody to one parent over the other is the best interests of the child. We have repeatedly stated the test originally set forth in *Hild v. Hild,* 221 Md. 349, 157 A.2d 442 (1960) as follows:

"For the purpose of ascertaining what is likely to be in the best interests and welfare of a child a court may properly consider, among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. It stands to reason that the fitness of a person to have custody is of vital importance. The paramount consideration, however, is the general overall well-being of the child."

*Id.* at 519, 615 A.2d 1190.

A change in circumstances ordinarily has been required for a change of custody. In *McCready v. McCready,* 323 Md. 476, 593 A.2d 1128 (1991), Judge McAuliffe said for the Court:

The question of whether there has been a material change in circumstances which relates to the welfare of the child is,

however, often of importance in a custody case. The desirability of maintaining stability in the life of a child is well recognized, and a change in custody may disturb that stability.

Stability is not, however, the sole reason for ordinarily requiring proof of a change in circumstances to justify a modification of an existing custody order. A litigious or disappointed parent must not be permitted to relitigate questions of custody endlessly upon the same facts, hoping to find a chancellor sympathetic to his or her claim. An order determining custody must be afforded some finality, even though it may subsequently be modified when changes so warrant to protect the best interest of the child. As we said in *Hardisty v. Salerno,* 255 Md. 436, 439, 258 A.2d 209 (1969), '[w]hile custody decrees are never final in Maryland, any reconsideration of a decree should emphasize changes in circumstances which have occurred subsequent to the last court hearing.' Even this general statement may be subject to exception in the case of prior facts existing but unknown and not reasonably discoverable at the time of the entry of the original order, such as the fact that a parent to whom custody had been granted was, and continues to be, a sexual abuser of the child. *See* Sharp, *Modification of Agreement–Based Custody Decrees: Unitary or Dual Standard?,* 68 Va.L.Rev. 1263, 1266–71 (1982).

*Id.* at 481–482, 593 A.2d 1128. See also *Domingues v. Johnson,* 323 Md. 486, 498 593 A.2d 1133 (1991).

█ Ordinarily, in determining custody the courts look to the situation as it exists at the time. This is well illustrated by *Raible v. Raible,* 242 Md. 586, 219 A.2d 777 (1966), where custody was awarded to an admittedly adulterous mother.[3] In that case Judge Oppenheimer said for the Court:

---

**3.** Apparently in *Hild v. Hild,* 221 Md. 349, 157 A.2d 442 (1960) the mother's adultery was the basis for reversal of an award of custody to her. See the vigorous dissenting opinion in that case by Judge Hammond, joined by Judge Henderson, beginning at page 361 of 221 Md., 157 A.2d 442.

No question of adultery is involved. The period of misconduct of the wife took place after her divorce and terminated two years before the hearing below. As Judge Hammond said for the Court in *Trudeau v. Trudeau,* 204 Md. 214, 218, 103 A.2d 563 (1954), 'no custody matter is the image of another and in none can the proper paths be plotted automatically on a map of the principles laid down by the cases.' *See also, Daubert v. Daubert,* 239 Md. 303, 308, 211 A.2d 323 (1965). The paramount, overriding consideration is the welfare of the children. In *Trudeau,* as here, the wife had ceased the conduct which was the basis for the attack upon her fitness, and the conclusion of the Chancellor that the mother's custody of the children should be continued (subject, always, to the continuing jurisdiction of the court) was affirmed. We found in *Trudeau,* as we find here, that there was no compelling reason which made the continuation of the mother's custody not in the best interests of the children.

*Id.* at 593, 219 A.2d 777. Attitudes relevant to adultery have changed somewhat as indicated by *Robinson, supra.* See also the discussion for the court by Judge Digges in *Davis,* 280 Md. at 127, 372 A.2d 231. That does not change the fact, however, that in *Raible* the Court was looking at the situation as it existed at the time of the hearing.

Although the procedure followed in *Sullivan* was disapproved, there was no disapproval of—nor was there an issue before the Court relative to—the language of Judge Orth for the Court of Special Appeals in *Sullivan.* Judge Orth said for the court:

It is our best judgment that the children remain in the custody of their mother. We believe that the compromise solution of the chancellor does not give due regard for the welfare of the children and find no strong reason affecting the welfare of the children to depart from the custody award under the divorce decree with which appellee had at one time been content. We cannot conceive how it would be in the best interest of the children to take them from the mother, place them with the father in Israel for three years,

then uproot them again and return them to the mother in the United States for three years, leaving their future at the end of the six year period to be later determined.

*Sullivan,* 12 Md.App. at 17–18, 276 A.2d 698.

The principle of requiring a change in circumstances for a change of custody is another indicator of looking at the circumstances as they exist at the time the custody order is passed.

In *Hild v. Hild,* 221 Md. 349, 357, 157 A.2d 442, (1960), as Judge Karwacki pointed out for the Court in *Robinson,* Judge Horney discussed for the Court factors to be considered in determining custody. This was summed up more recently in *Montgomery County v. Sanders,* 38 Md.App. 406, 381 A.2d 1154 (1978), Chief Judge Gilbert for this Court said that the factors to be considered in determining custody of a child include:

"but [are] not limited to, 1) fitness of the parents, 2) character and reputation of the parties, 3) desire of the natural parents and agreements between the parties, 4) potentiality of maintaining natural family relations, 5) preference of the child, 6) material opportunities affecting the future life of the child, 7) age, health and sex of the child, 8) residences of parents and opportunity for visitation, 9) length of separation from the natural parents, 10) prior voluntary abandonment or surrender." (citations omitted).

*Id.* at 420, 381 A.2d 1154.

We have not the faintest idea of what the situation of the parents may be at the time when this child completes the fifth grade, obviously a number of years hence. We know not what the living conditions of the parties at that time will be. We know not where the parties will be living. We do not know what their incomes will be. We have no idea of what kind of physical condition the parents or child will be in at that time. We do not know what the preference of the child at that time may be. We have no idea whatever as to the condition under which the parents will be living. Although thus far there has been no hint of immorality, we do not know what the situation

will be at the time of the contemplated change in custody. We do not know what effect a change in custody might have on the child. All of these are relevant considerations.

It is hard enough to look into the future and to determine what may be perceived as the best interest of the child on the basis of circumstances as they exist at the time of a custody hearing. We consider it to be an abuse of discretion to attempt to look ahead and to determine now that it will be in the best interests of a child who has not yet entered kindergarten to have his custody changed upon completion of the fifth grade.

## III.

## CHILD SUPPORT AND OTHER FINANCIAL MATTERS

Issues were briefed on appeal contending that the trial judge abused his discretion when he awarded *in futuro* child support, when he attributed certain annual income to Stephanie, and when he ordered her to execute a yearly waiver of the income tax dependency exemption for Garrett. At oral argument we were advised that we are not obliged to address those issues by virtue of a consent order entered into by the parties on January 12, 1998.

## IV.

## SUMMER VISITATION

Stephanie contends that the trial judge abused his discretion in awarding Michael six weeks of summer visitation "in light of Michael's extensive work and travel schedule." She refers to the fact that "the obligations of Michael's employment are demanding on his time," that "he works late nights, weekends and travels out of the country on a monthly basis." From this she argues that he "will have no choice but to place Garrett in the custody of a third party while Michael works." That does not necessarily follow. If Michael has visitation it will be up to him to work out just how he handles

the matter, subject, of course if necessary, to the approval of the trial court. We perceive no abuse of discretion.

## V.

### COUNSEL FEES

■ Stephanie complains because she says the trial judge failed to address her request for counsel fees. Michael's reply to that is that "[t]he trial judge stated throughout his opinions that the conditions that would justify the award of counsel fees were not present in this case." Unfortunately, however, Michael gives no citation to the record extract to back up this assertion. In *ACandS v. Asner*, 344 Md. 155, 190, 686 A.2d 250 (1996), Judge Rodowsky said for the Court of Appeals, after referring to the requirement of *Maryland Rule* 8–501(c) that the record extract "contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal," "[the Court of Special Appeals] has appropriately held that a party may lose the right to appeal on an issue by failing to indicate in that party's brief the location in the record where the alleged error occurred. *See Mitchell v. State*, 51 Md.App. 347, 357–58, 443 A.2d 651, 657, *cert. denied*, 459 U.S. 915, 103 S.Ct. 227, 74 L.Ed.2d 180 (1982)." *Id.* at 192, 686 A.2d 250.

Maryland Code (1991, 1997 Cum.Supp.), § 12–103, Family Law Article, provides in relevant part that "[t]he court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person ... applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties...."

This issue must be addressed. In *Scott v. Scott*, 103 Md. App. 500, 524–25, 653 A.2d 1017, 1029 (1995), this Court said, "The trial court never addressed Wife's request for fees and costs. Accordingly, we remand so the trial court may determine whether Wife is entitled to the attorney's fees she requested. The court shall articulate the basis for its deci-

sion." *(Citing Bagley v. Bagley,* 98 Md.App. 18, 41, 632 A.2d 229 (1993), *cert. denied* 334 Md. 18, 637 A.2d 1191 (1994)).

On the remand we respectfully but strongly recommend that the chancellor ask some other judge to consider the issue of counsel fees.

## VI.

### 401k PLAN

■ Stephanie next contends that the trial court committed reversible error by valuing Michael's 401k plan as of June 30, 1995, which was twenty months prior to the divorce decree's becoming final. She claims, "At the post-judgment motions hearing Stephanie requested the court to value the plan as of the date of divorce. (E.362–363). The trial court refused. This was clear error."

■ Pages 362 and 363 in the record extract are pages 41 and 42 in the transcript. Page 364 is transcript page 49 and page 365 is transcript page 50. These have no relation to the issue at hand. Nowhere on extract 362 or 363 does the trial judge rule on this contention. If he did so rule at some other place, it was the responsibility of counsel for Stephanie to provide a proper citation to the record extract. There is ample authority over the last fifty years or more to the effect that appellate courts are not obliged to go through the record to find where a point was actually ruled upon, if it was. Moreover, as Michael suggests, a trial judge is permitted to use a wide variety of methods to calculate value, citing, correctly, *Deering v. Deering,* 292 Md. 115, 129, 437 A.2d 883 (1981). He further asserts that a judge "can use any method he or she considers appropriate to the circumstances," citing *Goldberg v. Goldberg,* 96 Md.App. 771, 780–781, 626 A.2d 1062 (1993).

The point appears not to have been preserved for appellate review. Moreover, if we were to consider it on its merits, it would appear that we would be obliged to affirm.

## VII.

### PAYMENT OF MONETARY AWARD

■ Without citation of authority Stephanie argues:

The trial court ordered Stephanie's monetary award of $7,008.28 payable over 36 months. (E.400). Michael earns over $152,000 per year as a Vice–President of First National Bank. He had assets titled in his name worth at least $432,000 (E.038). He is under an order to pay child support of $883.00 per month. (E.221). He is ordered to pay nothing more. Under these circumstances, it was an abuse of the trial court's discretion in failing to order Michael to pay the $7,008.28 monetary award in a lump sum.

That is the complete argument presented on this point.

Maryland Code (1991, 1997 Cum.Supp.), § 8–205, Family Law Article, states in pertinent part:

(a) Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from one party to either or both parties, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded.

(b) The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) the contribution by either party of property described in 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

It will be observed that nothing has been pointed out by Stephanie to indicate that the trial judge failed to consider *any* factor set forth in § 8–205(b).

Not too long ago, in *Scott,* 103 Md.App. at 517, 653 A.2d 1017, the parties were arguing over whether payments should be made in an immediate lump sum payment or in installments. This Court said:

> It is well established that both the amount and manner of payment of a monetary award are committed to the discretion of the trial court. *Ross v. Ross,* 90 Md.App. 176, 188, 600 A.2d 891, *vacated on other grounds,* 327 Md. 101, 607 A.2d 933 (1992). 'The entire award can be made immediately due and payable or all or part of it can be made payable in the future.' *McClayton v. McClayton,* 68 Md.App. 615, 622, 515 A.2d 231 (1986).

We perceive no abuse of discretion on the part of the chancellor on this issue.

## VIII.

## RELOCATION OF THE PARTIES

Stephanie takes issue with that portion of the decree which states:

"4.   Ms. Schaefer's Relocation

This is the first occasion upon which Mr. Cusack has made this request.   Section 9–106(a)1 of the Family Law Article states:

> in any custody or visitation proceeding the court may include as a condition of a custody or visitation order a requirement that either party provide advance written notice of at least 45 days to the court, the other party, or both, of the intent to relocate the permanent residence of the party or the child either within or outside the State.

Because this request is reasonable under the circumstances, and because the court has been granted the statutory authority to issue such an order, Ms. Schaefer must inform Mr. Cusack at least 45 days in advance of an intention to relocate.   This is required of Mr. Cusack as well.   Further, unless some extraordinary or unusual circumstance compels it, neither party should live at a distance of 45 miles from one another.   The Court anticipates that the common sense of the parties will enforce this and that the parties, even if remarried, will live as close to one another as practicable."

Stephanie argues:

The trial court had no jurisdiction to restrict the parties from relocating to a distance of more than 45 miles from one another.   Regardless of the rationale underpinning this aspect of the trial court's ruling, it is clear that this ruling infringes upon Stephanie's liberties of autonomy, privacy, travel, family and marriage.   Stephanie and Garrett should be free to relocate unless the court makes a clear finding by clear and convincing evidence that such a move would endanger Garrett's safety.

As in all matters involving custody of children, this issue must be addressed under the best interest of the child formu-

la. Typically, issues involving relocation arise upon an attempt or request for relocation, not, as here, on a prohibition against relocation beyond a specified area. *See, e.g.,* Arthur B. LaFrance, *Child Custody and Relocation: A Constitutional Perspective,* 34 U. Louisville J. Fam. L. 1 (1995–96); Carol S. Bruch & Janet M. Bowermaster, *The Relocation of Children and Custodial Parents: Public Policy, Past and Present,* 30 Fam. L.Q. 2 (Summer 1996); Richard M. Bryan, *Beyond Burgess - One year later,* 20 Fam. Advocate 2 (Fall 1997) at 14.

We find significant what has been recently said by two respected courts of last resort addressing relocation issues.

The court opened its opinion *In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473 (1996), by saying that the case: "require[d] [it] to determine whether a parent seeking to relocate after dissolution of marriage is required to establish that the move is 'necessary' before he or she can be awarded physical custody of minor children" *Id.* 51 Cal. Rptr.2d 444, 913 P.2d at 476. In the course of the opinion it observed:

As this case demonstrates, ours is an increasingly mobile society. Amici curiae point out that approximately one American in five changes residences each year. Economic necessity and remarriage account for the bulk of relocations. Because of the ordinary needs for *both* parents after a marital dissolution to secure or retain employment, pursue educational or career opportunities, or reside in the same location as a new spouse or other family or friends, it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so. It would also undermine the interest in minimizing costly litigation over custody and require the trial courts to "micromanage" family decision making by second-guessing reasons for every day decisions about career and family.

More fundamentally, the "necessity" of relocating frequently has little, if any, substantive bearing on the suitability of a parent to retain the role of a custodial parent. A

parent who has been the primary caretaker for minor children is ordinarily no less capable of maintaining the responsibilities and obligations of parenting simply by virtue of a reasonable decision to change his or her geographical location.

*Id.*, 51 Cal.Rptr.2d 444, 913 P.2d at 480–81. The court opened footnote 6 by saying, "An obvious exception is a custodial parent's decision to relocate simply to frustrate the non-custodial parent's contact with the minor children."

In *Burgess*, as the court put it, "a parent with temporary physical custody of two minor children sought a judicial determination of permanent custody and expressed the intention to relocate with the children from Tehachapi to Lancaster, California, a distance of approximately 40 miles." This was permitted by the trial court. The Court of Appeal reversed. The Supreme Court of California reversed the Court of Appeal, saying:

[W]e recognize that bright line rules in this area are inappropriate: each case must be evaluated on its own unique facts. Although the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker the most often prevail, the trial court in assessing "prejudice" to the child's welfare as a result of relocating even a distance of 40 or 50 miles, may take into consideration the nature of the child's existing contact with both parents—including de facto as well as de jure custody arrangements—and the child's age, community ties, and health and educational needs. Where appropriate, it must take into account the preferences of the child.

*Id.*, 51 Cal.Rptr.2d 444, 913 P.2d at 483.

In *Tropea v. Tropea*, 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145 (1996), the court opened the opinion by stating, "In each of these appeals, a divorced spouse who was previously granted custody of the couple's minor offspring seeks permission to move away from the area in which the non-custodial spouse resides." The court referred to a "series of formulae and presumptions to aid them in making their decisions in

these difficult relocation cases" that lower courts had adopted. The first was "whether the proposed relocation would deprive the non-custodial parent of 'regular and meaningful access' to the child . . . ." (citing cases). The second was "[w]here a disruption of 'regular and meaningful access' is not shown, the inquiry is truncated and the courts generally will not go on to assess the merits and strength of the custodial parents' motive for moving." (citing cases) Then, "[w]here a disruption is established, a presumption that the move is not in the child's best interest is evoked and the custodial parent seeking to relocate must demonstrate 'exceptional circumstances' to justify the move . . . ." (citing cases) After that the "court will go on to consider the child's best interests." After observing that "[o]ne problem with the three-tiered analysis is that it is difficult to apply," the court said:

> On a more fundamental level, the three-tiered test is unsatisfactory because it erects artificial barriers to the courts' consideration of all of the relevant factors. Most moves outside of the non-custodial parent's locale have some disrupting effect on that parent's relationship with the child. Yet, if the disruption does not rise to the level of a deprivation of "meaningful access" the three-tiered analysis would permit it without any further inquiry in such salient considerations as the custodial parent's motives, the reasons for the proposed move and the positive or negative impact of the change on the child. Similarly, where the noncustodial parent has managed to overcome the threshold "meaningful access" hurdle, the three-tiered approach requires courts to refuse consent if there are no "exceptional circumstances" to justify the change, again without necessarily considering whether the move would serve the child's best interests or whether the benefits to the children would outweigh the diminution in access by the non-custodial parent. The distorting effect of such a mechanical approach may be amplified where the courts require a showing of economic necessity or health-related compulsion to establish the requisite "exceptional circumstances" [citing cases] or where

the demands of a new marriage are summarily rejected as a sufficient basis for satisfying this test.

*Id.,* 642 N.Y.S.2d 575, 665 N.E.2d at 149–150.

The New York Court of Appeals further stated:

Accordingly, rather than endorsing the three-tiered meaningful access exceptional-circumstances analysis that some of the lower courts have used in the past, we hold that each relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominate emphasis being placed on what outcome is most likely to serve the best interests of the child. While the respective rights of the custodial and noncustodial parents are unquestionably significant factors that must be considered [citing cases], it is the rights and needs of the children that must be accorded the greatest weight, since they are innocent victims of their parents' decision to divorce and are the least equipped to handle the stresses of the changing family situation.

*Id.,* 642 N.Y.S.2d 575, 665 N.E.2d at 150. *See also Frayne v. Frayne,* 651 N.Y.S.2d 583, 234 A.D.2d 545 (N.Y.App.Div.1996).

▪ In this case we have no findings or statements relative to the needs of the child in the imposition of this 45–mile limit. It does not necessarily follow that it should be permissible for the parents to be 44 miles apart but against the best interests of the child for them to be 46 miles apart. We hold that the best interest of the child can be determined better at the time a relocation is proposed than in an attempt to look into the future and to say now that the best interest of the child requires a present determination that a separation of the parents by more than 45 miles would have an adverse effect upon the child.

## IX.

## THE DIARIES

▪ Finally, Stephanie takes umbrage relative to the chancellor's requirement that "[u]ntil December 31, 1999, the

parents are to maintain diaries recording their personal histories of the implementation of this parental time schedule and such other pertinent matters as each parent may deem desirable."

Our research has not disclosed any case anywhere, anytime where such an issue has reached an appellate court. That is not to say, however, that there may not have been instances where courts have imposed such a mandate.

What a given parent may regard as a "pertinent matter[ ]" "desirable" to be recorded is an order hard to enforce, to put it mildly, because on any given matter other than the recordation of "personal histories of the implementation of this parental time schedule," a parent, if questioned, might simply say he or she did not regard it as pertinent or desirable to record the point.

When the parties "maintain diaries recording their personal histories of the implementation of th[e] parental time schedule", there will be a basis for refreshing recollections in the event of a dispute. We cannot say that the chancellor abused his discretion in imposing this requirement, novel as it may be.

## X.

## MOTION TO DISMISS CONTINGENT CROSS–APPEAL

Michael filed what he termed a "contingent" cross-appeal. Stephanie has moved to dismiss. She argues:

> The Memorandum Opinion dated February 25, 1997, disposed of all pending post-judgment motions. Accordingly, the docketing of the Memorandum Opinion had the effect of making the Final Judgment final for appeal purposes. The Memorandum Opinion was docketed on March 5, 1997.... Thus, the thirty-day period within which to timely note an appeal of the final judgment expired on April 4, 1997, thirty days from the date the Memorandum Opinion was docketed.

> Michael failed, prior to April 4, 1997, to note an appeal of the Final Judgment; rather, on or about April 15, 1997, Michael untimely filed what he styled as a Notice of Contin-

gent Cross–Appeal after having filed on or about March 6, 1997, the Petition for Modification, requesting the trial court to modify its Memorandum Opinion dated February 25, 1997. The Petition for Modification was improperly filed, was a nullity and should not have been treated as a post-judgment motion filed pursuant to Md. Rule 2–534 or 2–535. Because it requested the trial court to modify the decision which adjudicated Michael's post-judgment motions filed pursuant to Md. Rules 2–534 and 2–535. The Maryland Rules do not permit the filing of a motion challenging the denial of a post-judgment motion. *Office of People's Counsel v. Advance Mobile Home [Mobilehome] Corp.,* 75 Md. App. 39 [540 A.2d 151], *cert. denied,* 313 Md. 30 [542 A.2d 857] (1988).

Stephanie has it all wrong. Rule 2–534 states in pertinent part:

> In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment.

The new judgment becomes the final judgment.

The applicable legal principles are:

1. A motion to revise the judgment filed more than ten days (but within thirty days) after the judgment is docketed does not affect the finality of the judgment or the running of the time for appeal. (An appeal must be filed within thirty days after the judgment, not the denial of the motion).

2. After a judgment becomes enrolled (thirty days after it is docketed, if no appeal or motion to revise is filed), it may be revised only upon a showing of fraud, mistake, or irregularity.

3. A motion to revise the judgment filed within ten days of the judgment does deprive the judgment of its finality. (An appeal must be filed within thirty days after the motion is

denied; an appeal filed before the motion is ruled upon is premature.)

4.  When a timely motion to revise a judgment is filed and the circuit court in fact revises the judgment, the revised judgment becomes the effective final judgment in the case.

*People's Counsel* involved principles one and two. In *People's Counsel,* Advance filed a zoning appeal in the circuit court. That court affirmed. Fourteen days later, Advance filed a motion to revise the judgment. Several months later the court denied the motion. Four months after the entry of judgment and twenty-two days after the judge denied Advance's motion to revise, intervenors filed a motion to intervene and a motion to revise. The circuit court granted those motions. People's Counsel appealed. This court vacated the revised judgment and reinstated the original judgment. We reasoned that when the circuit court denied the motion to revise, the judgment became enrolled as of thirty days after its entry, and was thereafter subject to revision only upon a showing of fraud, mistake, or irregularity.

This case involves principles three and four:

May 3, 1996—the "Final Judgment" was docketed.

May 13, 1996 Michael filed a motion to revise the judgment. Since the motion was filed within ten days after the judgment, it deprived the judgment of its finality.

March 5, 1997—a revised judgment was docketed. Since the trial court in fact revised the judgment, the prior judgment lost whatever finality it might have, and the revised judgment became the effective final judgment in this case.

March 6, 1997—Michael filed a motion to revise the revised judgment. Since it was filed within ten days, it deprived the revised judgment of its finality. In *Edsall v. Anne Arundel County,* 332 Md. 502, 632 A.2d 763 (1993), the Court concluded its opinion by stating:

[A] notice of appeal filed prior to the withdrawal or disposition of a timely filed motion under Rule 2–532, 2–533 or 2–534 is effective. Processing of that appeal is delayed until

the withdrawal or disposition of the motion. The trial court retains jurisdiction to decide the matter notwithstanding the filing of the notice of appeal.

*Id.* at 332 Md. 508 [632 A.2d 766].

March 26, 1997—Stephanie filed a notice of appeal. (Although it was premature, it is "effective" but processing is delayed until the disposition of the motion to revise. See *Edsall*.)

April 9, 1997—The court granted in part and denied in part both the motion to revise and the motion to strike it. A revised judgment was entered; it became the effective final judgment.

April 15, 1997—Michael filed a notice of contingent cross-appeal.

April 28, 1997—Stephanie filed a second notice of appeal (which is within thirty days after the revised revised judgment.)

We conclude that Michael's notice of contingent cross-appeal was filed within thirty days after the entry of the revised revised judgment (that is, the effective final judgment). Therefore, it was timely filed. *See, Unnamed Att'y v. Attorney Grievance Comm'n,* 303 Md. 473, 486, 494 A.2d 940, 946 (1985).

## XI.

### VISITATION

In his first contention on the contingent cross-appeal Michael points out that under the visitation order issued by the chancellor in November, 1995, he was afforded parental time with young Garrett on each weekend. He says this order was in place from then until the end of February, 1997, "a total of sixteen months. At the time, that sixteen month period covered over one-third of Garrett's life." He argues that this "created a status-quo in Garrett's life" that the trial judge was required to consider before changing Mr. Cusack's parental time in his order of February 25, 1997. He contends that "the trial judge's opinion of February 25, 1997 does not manifest

any consideration of evidence as to the status quo in young Garrett's life to that point." We do not see it that way.

This is a bitterly contested case between contentious parties. One might even say overly contentious parties. The chancellor in this case obviously went to great lengths in a conscientious and thorough attempt to address the issues before him. The fact that he did not in so many words address the point made by Michael does not mean that the contention was not considered nor does it mean that he abused the discretion vested in him. We find it significant that relative to the change he said:

> The plaintiff produced a witness, Ms. Gentry, the head mistress of Cedarcroft School, which Garrett attends. Ms. Gentry testified that she has some concerns about Garrett. She believes that the visitation schedule is stressful for Garrett; and, in fact, would be stressful for any child. Ms. Gentry specifically testified that Mondays, after Mr. Cusack has delivered Garrett to Ms. Schaefer prior to Garrett coming to Cedar Croft, are stressful for him and that he cannot easily settle down. She stated that Garrett is prone to aggressiveness when his routine is changed. She testified that Garrett begins to settle down as the week progresses; but that his routine is then broken by the Wednesday/Thursday exchange between the parents, causing Garrett more stress. This evidence was persuasive, although there can be little doubt that there are other contributors to the young child's stress.

> Therefore, subject to voluntary agreed modifications of the parents, which the court strongly encourages as and when appropriate, the parental time schedule will be modified as follows.

The court then went on to set forth the terms of modification. We deem this contention to be without merit.

## XII.

### TESTIMONY OF MS. GENTRY

Michael makes the point that in the chancellor's opinion he quoted from the comments of Ms. Gentry which we have set

forth above. He contends that these "comments cannot properly be considered testimony as the trial judge did not have her swear to the truth of her testimony as required by Maryland Rule 5–603." He says that his attorney asked that Ms. Gentry be sworn but the trial judge stated that he did not find it necessary. From this he argues that the use and explicit reliance on Ms. Gentry's comments "constituted the rendering of a decision based on unsworn testimony or evidence."

When Ms. Gentry took the stand to testify the following exchange took place between the trial judge and the attorney for Michael:

The Court: Do you [Ms. Gentry] have personal memory of Garrett?

Counsel for Michael: Your Honor can [Ms. Gentry] be put under oath?

The Court: I don't think it's necessary. If you insist we can.

The attorney for Michael did not insist. She testified. There was no objection to her testimony. The attorney for Michael did not move to strike the testimony. Michael's attorney had the opportunity to cross-examine Ms. Gentry. Rule 2–517 states in pertinent part:

An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as a grounds for objection become apparent. Otherwise, the objection is waived.

Professor Lynn McLain in her excellent work on *Maryland Evidence,* Section 603.1 at 26 (1987) states:

"Objection to a witness' testifying who has not made an oath or affirmation will be considered waived unless made before the testimony or, if the witness is not on the stand as soon as it should be apparent that the witness is testifying."

We deem the point waived.

**MOTION TO DISMISS APPEAL AND MOTION TO DISMISS CONTINGENT CROSS–APPEAL DENIED;**

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.