883 A.2d 966

**James CREMINS, et al.**

v.

**COUNTY COMMISSIONERS OF WASHINGTON COUNTY, Maryland, et al.**

**No. 2200, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 29, 2005.

428

William C. Wantz of Hagerstown, for appellant.

William J. Chen, Jr. of Rockville, E. Kenneth Grove(Mark D. Thomas on the brief), Hagerstown, for appellee.

JAMES R. EYLER, ADKINS, BARBERA, JJ.

BARBERA, J.

In Washington County, an application to rezone a parcel of property to a "Planned Unit Development," or "PUD," must pass through a five-step review and approval process. *See* Washington County Zoning Ordinance § 16.5.[1] This appeal

---

1. Hereinafter, unless otherwise indicated, all citations are to the Washington County Zoning Ordinance.

involves step two of that process, "Zoning Approval." At that step, a party seeking re-zoning of his or her property to a PUD must obtain approval of the re-zoning from the County Commissioners of Washington County ("County Commissioners"), after a joint public hearing before the Washington County Planning Commission ("Planning Commission") and the County Commissioners.

Appellants, James Cremins, *et al.*,[2] reside in Foxleigh Meadows, a single-family residential subdivision located adjacent to the property that is the subject of this appeal. They appeal from a judgment in the Circuit Court for Washington County, rendered in favor of the County Commissioners and Paul N. Crampton, Jr. (collectively, "appellees"). That judgment affirmed the County Commissioners' decision to re-zone certain property to the PUD zoning classification.

Appellants present four questions for our review, which we have re-ordered:

I. In a piecemeal rezoning hearing, may facts presented by unsworn witnesses be considered in determining whether the applicant's case is supported by substantial evidence?

II. Is remand inappropriate in the absence of substantial evidence of adequacy of the adjacent roadway and of general compatibility?

III. In Washington County, may a planned unit development floating zone be established in the absence of an affirmative finding by the rezoning authority that the proposed site is located adjacent to an adequate roadway, as required by the applicable zoning ordinance?

IV. In Washington County, should the reasonably probable of fruition requirement or a concurrency standard be applied in the floating zone compatibility analysis?

For the reasons that follow, we affirm.

---

**2.** The other appellants include: Karen Cremins, Michael G. Marschner, Angela K. Marschner, Joseph W. Kinter, Patricia A. Kinter, Merih O'Donoghue, Renee L. Scott, Joseph M. Sebrosky, Kathleen A. Sebrosky, Catherine Skaggs, and Kelly Bennet–Unger.

## FACTS AND LEGAL PROCEEDINGS

On November 7, 2002, Mr. Crampton filed an "Ordinance Amendment Application" ("the application") with the Planning Commission. Mr. Crampton proposed to reclassify a 97.27 acre parcel of land ("the property") from its "A" Agricultural zoning designation to the "A" Agricultural Planned Unit Development ("PUD") zone.[3] The property, also referred to as "Emerald Pointe PUD," is bounded on the west by Marsh Pike and on the east by a large parcel of private property that is used for agricultural purposes. To the north is Longmeadow Road and on the property's southern border is Maryland Route 60.

During the Concept Plan Review step of the PUD rezoning process, see § 16.5(a)(1), several local administrative agencies submitted reports and recommendations to the Planning Commission concerning the application. None of these agencies had objections to the application at that stage of the review and approval process.[4] The Planning Commission also received letters from neighboring property owners in support of and opposed to the application.

On January 13, 2003, a joint public hearing on the application was held before the Planning Commission and the County Commissioners. See § 16.5(a)(2). At the outset of the hearing, at which no oaths were administered, a staff member of the Planning Commission discussed the "Staff Report and Analysis" (the "Report") that was conducted in response to the application. The Report included enrollment figures for the public schools serving the property, and a statement that the

---

3. The land is owned by Rokane, LLC. Rokane authorized Mr. Crampton to file the rezoning application.

4. For example, the Washington County Engineering Department had no objections to the application and noted that any of its concerns could "be adequately addressed through [the remaining steps of] the site plan approval process." The Washington County Health Department stated that its approval would be "contingent on the availability of public water and sewer" services for the property. The Washington County Water & Sewer Department determined that the property is "eligible for public [sewer] service."

Maryland State Highway Administration ("MSHA") had requested that access to the property be limited to Marsh Pike.

Attached to the Report was a "Preliminary Consultation" ("the Consultation"), prepared by the Planning Commission. The Consultation reflected that Mr. Crampton and several officials, including members of the Washington County Engineering Department (the "Engineering Department") and the Washington County Planning Department, had met to discuss, among other things, the traffic conditions along Marsh Pike. The Consultation noted that the Engineering Department had decided that Mr. Crampton and the Washington County officials would have to reach an agreement on "the liability and maintenance of [a] proposed median" at any entrance to the property on Marsh Pike. The Engineering Department also stated that the "Traffic Impact Study" would have to be revised.

The Planning Commission staff member stated at the joint hearing that Mr. Crampton proposed that the property be developed to include 89 semi-detached or duplex lots, 88 single family lots, 92 townhouse lots, a residential retirement center, a community center, and 9,000 square feet of commercial development. The staff member also stated that the Engineering Department and MSHA had requested updated traffic impact studies.

Mr. Crampton appeared at the joint hearing. He discussed the application and the development proposal in detail, noting in his statement that 35 to 40 units would be added to the development each year, and that the entire project would take 10 to 15 years to complete.

An engineer with Fox & Associates also appeared in support of the application. He discussed the application and stated that a company called "Street Traffic Group" had prepared a traffic study for the property. He reported that the traffic study indicates "that the existing system could be supported by the surrounding area network and the critical intersections will continue to operate at acceptable levels of service with the full development of the PUD provided that

some improvements are made."[5] The Engineering Department and MSHA had a copy of the study and were reviewing it, and had several preliminary comments regarding traffic along Marsh Pike, including that Marsh Pike needed "widening" and other improvements at intersections along Marsh Pike. The engineer did not know whether the Engineering Department and MSHA had made formal comments on the traffic study as of the date of the hearing. The engineer also stated that the property would "have a minimal impact on [public] schools."

More than 25 members of the public, several of whom are appellants, spoke in opposition to the application. The protestants generally asserted that the existing public schools did not have the capacity to handle the influx of children the development of the PUD would produce, the PUD was not compatible with neighboring properties, and the development would adversely affect traffic along Marsh Pike.

The chairperson of the Planning Commission stated that the "file" would remain open for 10 days to allow additional comments to be submitted to the County Commissioners before they decided whether to approve the application.

On March 3, 2003, the Planning Commission voted three-to-one to recommend that the County Commissioners deny the application. In a letter dated the following day, the Planning Commission informed the County Commissioners of its recommendation. The Planning Commission stated that it "based this recommendation on" the traffic study submitted at the January 23, 2003 hearing, and on "concerns that the residential development density proposed for the [property] was not consistent with the residential density in adjacent developments." The Planning Commission also stated its "opinion that the road infrastructure in the immediate vicinity of the [property] was defici[ent.]"

---

**5.** The traffic study was submitted to the County Commissioners and Planning Commission, but was not made part of the record before the circuit court and is not before us.

On March 13, 2003, the County Commissioners held a regular meeting to consider and vote on the application. The County Commissioners voted unanimously to accept "the findings of fact as set forth in the report from the County Attorney." [6] The County Commissioners also voted three-to-one to approve the rezoning of the property to PUD. Pertinent to this appeal, the County Commissioners made the following findings of fact:

### Education Facilities

The proposed residential uses within the PUD are single-family, semi-detached units, and townhouses. The single-family and semi-detached units would be exempt from the Article V School section of the Adequate Public Facilities Ordinance because this property is situated within the Urban Growth Area. Townhouses, however, would not be exempt. The subject property is located within the school districts of Paramount Elementary, Northern Middle, and North Hagerstown High School.

\* \* \*

### Present and future transportation patterns in the area.

The subject property ... has approximately 3,080 feet of frontage along Marsh Pike. The Washington County Highway Plan classifies this section of Marsh Pike as a Major Collector, which requires a minimum distance of 300 feet between all new access points and 40 feet of future dedicated right of way from centerline. This classification's major function is to provide for intra-county travel.... The property has approximately 1,082 feet of frontage along Leitersburg Pike, an Intermediate Arterial.... One access point onto Leitersburg Pike from Emerald Pointe has been proposed, however, the [MSHA] has requested that all access points to the development be limited to Marsh Pike.

---

6. The report of the County Attorney was not made part of the record that was transmitted to us. We granted a motion by the County Commissioners to supplement the record with the County Attorney's report.

The ... Engineering Department and the [MSHA] made numerous comments regarding the subject property's impact on surrounding roadways and internal street design....

\* \* \*

The Planning Commission opined that the road infrastructure in the immediate vicinity of the subject property was deficient based upon a traffic study submitted by [Mr. Crampton] and that the residential development density proposed for the subject property was not consistent with the residential density in adjacent developments.

For the reasons set forth elsewhere in these findings of fact, [the County Commissioners] respectfully decline[] to adopt this opinion.

\* \* \*

**Effect of the PUD on community infrastructure.**

*The adoption of the Adequate Public Facilities Ordinance (APFO) in 1990 has taken on a supportive role that was previously the sole responsibility of this item in the zoning ordinance during the rezoning stage when considering the deliberation of PUD cases. Due to this change, it would appear that now the Planning Commission and the [County Commissioners] would only have to address infrastructure issues at the zoning stage that would appear to be highly unsolvable.*

A major concern of neighborhood residents who testified at the public hearing and who sent in correspondence during the comment period dealt with the PUD's effect on the area road network as a result of increased traffic. Terrence McGee, Chief Engineer, County Engineering Department, did not take exception to the rezoning and responded to this application by stating, "all issues under our jurisdiction associated with this request can be adequately addressed through the site plan approval process." One of the major comments is that the existing Traffic Impact

Study will need to be revised to reflect the new plan. To date, the [ ] Engineering Department has no final comments with regard to the updated traffic study. . . .

Another item that generated a significant amount of testimony at the public hearing was the issue of the PUD's impact on the neighborhood schools of Northern Middle, North Hagerstown High and, in particular, Paramount Elementary. . . .

[Data pertaining to school capacity and projected student population is omitted.]

. . . . Discarding the units proposed for the retirement center, there would be 267 units subjected to APFO testing under the new policies. This would equate to 54 students or a total of 108 students projected from this development or in the pipeline. Since the PUD is projected for a build out over ten years, it is reasonable to assume that not all 54 students would come on line in the same year. With an available capacity of 81 students, it would seem that projected student population from this PUD as well as approved developments would not generate an inadequate condition in the near future. . . .

The PUD article of the zoning ordinance was adopted prior to the adoption of the APFO. Within the context of the PUD article . . ., references are made regarding impact on infrastructure (sections 16.0 and 16.7(a)). Neither of these references says that public school capacity must be adequate in order for a PUD zoning to be approved. However, the impact on the public schools must be given consideration when determining the appropriateness of the PUD and the proposed density. The APFO, on the other hand, allows the [County Commissioners] and the Planning Commission to take control of school adequacy issues associated with new development. . . .

. . . . During the Development Plan review stages, [Mr. Crampton] should be investigating the adequacy of the schools and prepare a course of action if an adequacy problem is anticipated. The Planning Commission shall determine if the schools are adequate during the Final

Development Plan review stage. As specified under [ ] section 16.6(d)2ii, agreements for responsibility between County and developer for providing on-site and off-site improvements[ ] shall be developed as part of the Final Development Plan. This would include addressing the developer's responsibility for school adequacy if he intends to continue with the project. If any of the schools are determined to be inadequate, and the developer does not wish to make them so, the final plat or site plan cannot be approved. If approval of the plat does not occur within six months, the PUD zoning designation would be lost and the property would revert back to its original, underlying classification.

(Emphasis added.)

Appellants filed a petition for judicial review of the County Commissioners' decision, in the Circuit Court for Washington County. Appellees participated in the petition. After a hearing, the court issued an opinion and order affirming the County Commissioners' decision.[7]

Appellants noted this timely appeal. We shall add facts as they become pertinent to our discussion.

## STANDARD OF REVIEW

■■ When we review the decision of an administrative agency, our role is the same as that of the circuit court. *Capital Commercial Props., Inc. v. Montgomery County Planning Bd.*, 158 Md.App. 88, 95, 854 A.2d 283 (2004). We may not substitute our judgment for that of the agency. *Id.* We have said that, "[i]n zoning matters, the zoning agency is considered to be the expert in the assessment of the evidence, not the court." *Bowman Group v. Moser,* 112 Md.App. 694, 699, 686 A.2d 643 (1996), *cert. denied,* 344 Md. 568, 688 A.2d 446 (1997). *See also White v. Spring,* 109 Md.App. 692, 699, 675 A.2d 1023, *cert. denied,* 343 Md. 680, 684 A.2d 455 (1996).

---

7. Because we ordinarily do not review the circuit court's decision, *see Days Cove Reclamation Co. v. Queen Anne's County,* 146 Md.App. 469, 484, 807 A.2d 156, *cert. denied,* 372 Md. 431, 813 A.2d 258 (2002), we do not summarize it here.

■ We have said that, in all zoning cases, including floating zone cases, the reviewing court should not " 'zone or rezone, or [ ] substitute its judgment for that of the zoning authority if the action of the zoning authority is based on substantial evidence and the issue is thus fairly debatable.' " *Montgomery County v. Greater Colesville Citizens' Ass'n,* 70 Md.App. 374, 381, 521 A.2d 770 (1987) (quoting *Northampton Corp. v. Prince George's* County, 273 Md. 93, 101, 327 A.2d 774 (1974)). *See also Stansbury v. Jones,* 372 Md. 172, 182, 812 A.2d 312 (2002). "The basic reason for the fairly debatable standard is that zoning matters are, first of all, legislative functions and, absent arbitrary and capricious actions, are presumptively correct, if based upon substantial evidence, even if substantial evidence to the contrary exists." *White,* 109 Md.App. at 699, 675 A.2d 1023.

■ There is substantial evidence to support the zoning agency's conclusion if "reasoning minds could reasonably reach [the] conclusion from facts in the record[.]" *Stansbury,* 372 Md. at 182–83, 812 A.2d 312. Evidence is "substantial" "if there is 'a little more than a "scintilla of evidence." ' " *Greater Colesville,* 70 Md.App. at 382, 521 A.2d 770 (citation omitted). *See also Lucas v. People's Counsel for Baltimore County,* 147 Md.App. 209, 225, 807 A.2d 1176 (2002).

■ The standard for judicial review of an administrative agency's legal rulings requires the reviewing court to " 'determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 573–74 n. 3, 873 A.2d 1145 (2005) (citations omitted). In making this determination, the reviewing court " 'must review the agency's decision in the light most favorable to it,' " and the decision of the agency is deemed " 'prima facie correct and presumed valid[.]' " *Id.* (citations omitted.) In addition, "the agency's interpretations and applications of [the] statutory or regulatory provisions" that it administers should be afforded considerable weight, and " 'the expertise of the agency in its own field should be respected.' " *Id.* (citations omitted.)

## DISCUSSION

### *The PUD re-zoning process in Washington County*

We are asked in this appeal to decide whether the County Commissioners properly interpreted the Zoning Ordinance for Washington County and the APFO. We begin with a discussion of the County Commissioners' authority to re-zone property to the PUD classification, and the process through which an application for re-zoning must pass.

The authority of the County Commissioners to reclassify the zoning of property in Washington County is derived from Maryland Code (1957, 2003 Repl.Vol.), Article 66B ("Article 66B"). *See Bd. of County Comm'rs of Washington County v. H. Manny Holtz, Inc.*, 60 Md.App. 133, 135 n. 1, 481 A.2d 513 (1984) (noting that Article 66B authorizes Washington County to create a Board of Zoning Appeals with limited authority, and recognizing that "[a]pplications for reclassification [of land] must be made directly to the Board of County Commissioners, which alone is authorized to approve them"). Article 66B, § 10.01(a) specifically authorizes the County Commissioners "to enact[] ordinances or laws providing for or requiring," *inter alia*, PUDs and floating zones.

Section 27.1 of the zoning ordinance authorizes an individual to petition the County Commissioners for a re-zoning of property. The provisions specifically governing the rezoning of land in Washington County to a PUD or floating zone are located in Article 16 of the zoning ordinance. Section 16.0, entitled "Purpose," provides:

> The intent of these PUD regulations is to permit a greater degree of flexibility and more creativity in the design and development of residential areas than is possible under conventional zoning standards. The purpose is also to promote a more economical and efficient use of the land while providing for a harmonious variety of housing choices, a more varied level of community amenities, and the promotion of adequate open space and scenic attractiveness.

> The PUD is a floating zone that may be established in any of the Districts specified in Section 16.4. The change or

mistake rule does not apply to the PUD process, but the Planning Commission and the Board of County Commissioners, in the deliberation of a PUD application, shall establish findings of fact that consider, at a minimum, the purpose of the PUD District, the applicable policies of the adopted Comprehensive Plan for the County, the compatibility of the proposed PUD with neighboring properties, and the effect of the PUD on community infrastructure.

Section 16.5 outlines a "multi-step" review and approval process for a PUD re-zoning application. Subsection (a) of that section provides, in pertinent part:

Design and Development Schedule: It is the intent of this Ordinance that the PUD not be a speculative device. The Concept Plan as submitted by the applicant shall reflect the actual development to be designed and constructed within a reasonable time frame. Each phase of the design and development review process must occur within specified periods. If the applicant fails to submit his plans, or if construction does not commence, as specified by this Ordinance, the zoning of the site shall automatically revert to its previous classification.

If the applicant abandons the plans for the PUD at any time prior to the start of construction before the automatic reversion date and desires to proceed with development permitted under the previous zoning, he may do so by submitting notification to the Planning Commission. Such notification shall constitute official withdrawal of the applicant's plans for the PUD and shall permit reversion of the previous zoning classification without the necessity of the rezoning process.

1. Concept Plan Review: The purpose of the Concept Plan Review is to provide an exchange of information between the developer and the Planning Commission. The intent is that the developer provide the [Planning] Commission with general information for the layout, density, specific uses and the like. The [Planning]

Commission, in turn, will provide the developer with corresponding response.

2. Zoning Approval: Following the Concept Plan Review, a joint public hearing with the Board of County Commissioners and the Planning Commission will be scheduled. Within 120 days after the public hearing, the Board of County Commissioners, after receiving a recommendation from the Planning Commission, shall render a decision on the PUD application. Zoning approval constitutes tentative approval of density and design features as shown on the Concept Plan. Minor changes in concept design may subsequently be approved by the Planning Commission without an additional public hearing.

(Footnote omitted.)

The remaining three steps of the review and approval process require approval of the Planning Commission. *See* § 16.5(a)3. through 5.

Two other provisions of the zoning ordinance concern traffic. Section 16.4(b), which is one of the provisions we are asked to interpret in this appeal, provides that, as a general requirement, a PUD "shall be located ... adjacent to adequate roadway facilities capable of serving existing traffic and the future traffic generated by the uses in the PUD." Section 16.7(i), titled "Traffic Circulation and Parking," provides:

1. Existing and planned streets and highways shall be of sufficient capacity to serve existing traffic and all new traffic when fully developed.

2. The capacity of existing streets and highways serving a PUD shall be considered by the [Planning] Commission in determining density. Density resulting in traffic capacity being exceeded on streets and highways shall not be permitted.

In 1990, Washington County approved an APFO pursuant to the authority granted it by Article 66B, § 10.01. *See* APFO Article XII. Section 1.2 of the APFO provides:

It is the purpose of the [County Commissioners] that public facilities and services needed to support new development shall be available concurrently with the impacts of such new developments. In meeting this purpose, public facility and service availability shall be deemed sufficient if the public facilities and services for new development are phased, or the new development is phased, so that the public facilities and those related services which are deemed necessary by the local government to operate the facilities necessitated by that new development, are available concurrently with the impacts of the new development.

Article 66B, § 4.04(b)(1) provides that a decision of the County Commissioners to rezone a portion of land "may not become effective until 10 days after at least one public hearing on the matter, at which parties in interest and citizens shall have an opportunity to be heard."

Section 27.2 of the zoning ordinance requires, *inter alia*, that the County Commissioners "hold at least one public hearing" before making a "map amendment." Following the public hearing, the County Commissioners must "make findings of fact in each specific case" involving an application for re-zoning approval to a PUD. § 27.3. Section 27.3 requires that the County Commissioners make findings of fact involving, *inter alia*, "the following matters":

(a) The report and recommendations of the [Planning Commission].

(b) Population change in the area of the proposed change.

(c) Availability of public facilities in the area.

(d) Present and future transportation patterns in the area.

(e) Compatibility with existing and proposed development of the area including indication of neighboring sites identified by the Washington County Historic Sites Survey and subsequent revisions or updates.

(f) The relationship of the proposed change to the Adopted Plan For the County, Development Analysis Plan Map and Policies.

* * *

(i) Whether there has been a convincing demonstration that the proposed rezoning would be appropriate and logical for the subject property.

### Issues 1 and 2: The joint public hearing in this case and the appropriateness of a remand

Appellants contend that the County Commissioners' decision cannot properly be sustained because, at the January 13, 2003 joint public hearing, all of the "testimony" presented in favor of the application was "unsworn." It follows, appellants argue, that the evidence presented at the joint public hearing "may not be considered" in determining whether the County Commissioners' decision is supported by substantial, competent evidence.

Appellees counter that appellants did not object to the lack of an oath given at the joint public hearing; therefore, the argument is waived. Appellees further assert that, should we reach the merits of the argument, there is no requirement in statute, the County Code, or case law that "testimony" at a public hearing like the one in this case be given under oath.

▮ Appellees are correct that appellants, many of whom spoke at the joint public hearing without having taken an oath, did not object or otherwise raise the issue at the hearing. Appellants, moreover, remained silent on this subject during the 10–day period in which the "file" remained open for the County Commissioners to receive written materials.

▮ "A party who knows or should have known that an administrative agency has committed an error and who, despite an opportunity to do so, fails to object in any way or at any time during the course of the administrative proceedings," may not thereafter complain about the error at a judicial proceeding. *Cicala v. Disability Review Bd. for Prince George's County*, 288 Md. 254, 261–62, 418 A.2d 205 (1980). *See also id.* at 262–63, 418 A.2d 205 (stating that failure of appellant's attorney to object at a hearing before the Disabili-

ty Review Board that the Board did not have a report that it was required to obtain and consider, cannot thereafter properly raise the issue at the judicial review proceeding and therefore cannot properly raise the issue before the appellate court); *Capital Commercial,* 158 Md.App. at 102, 854 A.2d 283 (holding that because the appellant did not present to the administrative agency the argument it raised before this Court, the issue was not preserved, and holding that, even if preserved, the argument failed); *Brzowski v. Maryland Home Improvement Comm'n,* 114 Md.App. 615, 691 A.2d 699 (holding that, despite the merits of the argument the appellant raised on appeal, the issue was not preserved for judicial review because it was not raised before the administrative agency), *cert. denied,* 346 Md. 238, 695 A.2d 1227 (1997); *Templeton v. County Council of Prince George's County,* 21 Md.App. 636, 645, 321 A.2d 778 (1974) (holding that, because the appellant did not present a question before a hearing examiner or District Council, the question was "not properly before this Court"); *cf. Anne Arundel County v. Nes,* 163 Md.App. 515, 535–36, 881 A.2d 1161 (2005), (holding that the appellees' argument was waived because they had "expressly abandoned" the argument before the administrative agency).

We have previously addressed the question of waiver of a challenge to the use of unsworn statements by a witness, albeit in the context of a contested custody case. *See Schaefer v. Cusack,* 124 Md.App. 288, 722 A.2d 73 (1998). In that case, the complaint was raised on appeal that the chancellor had erroneously relied in its custody decision on the testimony of the child's headmistress, after having decided that it was not necessary to have her put under oath. *Id.* at 312–13, 722 A.2d 73. We said, in response to the claim:

> The attorney for [the cross-appellant] did not insist [that the witness be sworn]. She testified. There was no objection to her testimony. The attorney for [the cross-appellant] did not move to strike the testimony. [The cross-appellant]'s attorney had the opportunity to cross-examine Ms. Gentry. Rule 2–517 states in pertinent part:

An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as a grounds for objection become apparent. Otherwise, the objection is waived.

Professor Lynn McLain in her excellent work on *Maryland Evidence*, Section 603.1 at 26 (1987) states:

"Objection to a witness' testifying who has not made an oath or affirmation will be considered waived unless made before the testimony or, if the witness is not on the stand as soon as it should be apparent that the witness is testifying."

We deem the point waived.

*Id.* at 313, 722 A.2d 73.

▇▇▇▇▇▇ We can conceive of no reason why the same waiver rule ought not apply to the present case. The failure of appellants to object to the witnesses' not being sworn at the joint hearing constitutes a waiver of appellants' right to complain now.[8]

▇▇▇▇ Even if we discount the unsworn witness testimony, however, there was substantial evidence before the County Commissioners to make the issues raised in this appeal fairly debatable. Indeed, the only ground upon which appellants rely in their argument that the County Commissioners lacked

---

**8.** In *Heard v. Foxshire Assocs.*, 145 Md.App. 695, 806 A.2d 348 (2002), we discussed, in *dicta*, the general nature of proceedings before administrative agencies. We said that, because judicial review of the decision of an administrative agency at both the circuit court and appellate levels is based on the record made before the agency, it is essential that the record of the administrative proceedings be orderly and accurate. *Id.* at 710, 806 A.2d 348. Therefore, "it is important that the presiding officer [of the administrative agency proceedings] be certain that witnesses are properly sworn and identified and that the record does not contain unsworn comments by unidentified persons." *Id.* at 709–10, 806 A.2d 348. In addition, "[i]t is equally important that [all] documents and other exhibits be carefully identified and cataloged in the record." *Id.* at 710, 806 A.2d 348.

Although appellants have waived their right to complain that the witnesses at the joint public hearing were not placed under oath, we reaffirm the importance of having witnesses sworn at such proceedings.

substantial evidence to support their findings is that "[r]emoving unsworn commentary and argument of counsel from the body of evidence before the [County Commissioners] leaves the decision of the [County Commissioners] unsupported." We disagree.

The County Commissioners had before them numerous documents. Included among those documents were Mr. Crampton's application; the minutes of the Planning Commission's meeting during which the Planning Commission voted against approving the application; numerous letters from individuals opposed to the re-zoning application; zoning maps; a plat of the property; the Report of the Planning Commission's staff; a deed to the property; and recommendation reports of several agencies including the Engineering Department, Health Department, MSHA, and the Washington County Water & Sewer Department.

Appellants make no argument that those documents do not constitute substantial evidence upon which the County Commissioners could render their decision. Appellants argue only that the documentary evidence came from Mr. Crampton, the Planning Commission, and appellants, yet the County Commissioners did not require any of them to face cross-examination before submitting those documents. Appellants maintain that all of this documentary evidence should have been placed before the County Commissioners by sworn witnesses who faced cross-examination, and, therefore, it should not have been considered by them.

We disagree. "A zoning board, along with other administrative agencies, is generally not bound by the technical rules of evidence although it must observe fundamental fairness in dealing with the parties who appear before it." *Ginn v. Farley*, 43 Md.App. 229, 236, 403 A.2d 858, *cert. denied, sub nom. Engel v. Farley*, 286 Md. 747 (1979). *See also Entzian v. Prince George's County*, 32 Md.App. 256, 262, 360 A.2d 6 (1976) (recognizing that "zoning agency bodies [ ] are not bound by strict rules of evidence"). The documents properly could be considered by the County Commissioners.

We have reviewed the documents and conclude that they make fairly debatable the appropriateness of rezoning the property to the PUD zone. In other words, the County Commissioners' decision, even without the unsworn witness statements, was supported by substantial evidence.

Because we hold that there was substantial evidence in the record to support the County Commissioners' decision, we need not discuss appellants' contention that we should reverse that decision without remand.

### Issue 3: Interpretation of § 16.4

Appellants assert that § 16.4(b) requires the County Commissioners to make a specific factual finding concerning whether the site for a proposed PUD is "capable of serving existing traffic and the future traffic generated by the uses in the PUD." Appellants argue that nothing in the zoning ordinance authorizes the County Commissioners to defer a finding of roadway adequacy. Appellants insist that the finding must be made at the time the County Commissioners decide whether to re-zone a property to PUD, *i.e.*, after the joint public hearing that occurs at the second step of the PUD review and approval process.

Appellees respond that § 16.4(b) should not be read in isolation. They contend that re-zoning land to the PUD zone is a multi-step process under § 16.5, and that the County Commissioners properly determined that § 16.4(b) should be read in conjunction with the rest of the zoning ordinance and the APFO.

Whether the County Commissioners properly construed the zoning ordinance is a question of law. *See Capital Commercial*, 158 Md.App. at 96, 854 A.2d 283 (noting that " '[a] challenge as to a regulatory interpretation is, of course, a legal issue' ") (citation omitted). Our task, therefore, is to determine whether the County Commissioners " ' "interpreted and applied the correct principles of law governing the case[.]" ' " *Lucas v. People's Counsel for Baltimore County*, 147 Md.App. 209, 225, 807 A.2d 1176 (2002) (quoting *Eastern Outdoor*

*Adver. Co. v. Mayor & City Council of Baltimore,* 128 Md. App. 494, 514, 739 A.2d 854 (1999), *cert. denied,* 358 Md. 163, 747 A.2d 644 (2000)). We nevertheless keep in mind our obligation to give considerable weight to "an administrative agency's interpretation and application of the statute which the agency administers[.]" *Noland,* 386 Md. at 572, 873 A.2d 1145.

When we review the interpretation of a local zoning regulation, we do so "under the same canons of construction that apply to the interpretation of statutes." *O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d 1191 (2004). " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Motor Vehicle Admin. v. Jones,* 380 Md. 164, 175, 844 A.2d 388 (2004) (quoting *Holbrook v. State,* 364 Md. 354, 364, 772 A.2d 1240 (2001)). We assign words in a statute or, as here, an ordinance, their ordinary and natural meaning. *O'Connor,* 382 Md. at 113, 854 A.2d 1191. When the plain language of the provision "is clear and unambiguous, our inquiry ordinarily ends[.]" *Christopher v. Montgomery County Dep't of Health & Human Servs.,* 381 Md. 188, 209, 849 A.2d 46 (2004) (quotation marks and citation omitted). Only when the language is ambiguous do we look beyond the provision's plain language to discern the legislative intent. *Jones,* 380 Md. at 176, 844 A.2d 388.

Moreover, when we "constru[e] two statutes that involve the same subject matter, a harmonious interpretation of the statutes is 'strongly favor[ed].' " *Dep't. of Public Safety & Corr. Servs. v. Beard,* 142 Md.App. 283, 302, 790 A.2d 57, *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002) (citation omitted). When "two enactments—one general, the other specific— appear to cover the same subject, the specific enactment applies." *Id.*

Section 16.4(b) provides, in pertinent part: "The specific site [of the PUD] shall be located adjacent to adequate roadway facilities capable of serving existing traffic and the future traffic generated by the uses in the PUD." Appellants

argue that the plain language of the ordinance mandates that, when the County Commissioners decide to re-zone property to a PUD, *i.e.*, step two of the re-zoning process, the property must be located adjacent to roadway facilities that are at that time "capable of serving existing traffic and the future traffic generated by the uses in the PUD." We disagree.

Section 16.4(b) plainly and simply states the County Commissioners' intention that a specific piece of property, re-zoned as a PUD, be located adjacent to roadway facilities that can adequately support the uses generated by the PUD. Contrary to appellant's argument, the statute does not state, or even imply, that the County Commissioners must assure themselves, at the time of re-zoning, that roadways adjacent to the property are able at that time to accommodate future traffic generated by the uses of the PUD.

A statute that " 'is part of a statutory scheme' " must not be read in isolation; instead, the statute must be read together with the rest of the statutory scheme to ascertain the true intention of the Legislature. *Mayor & Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 551, 814 A.2d 469 (2002) (citation omitted). *See also Marsheck v. Bd. of Trustees,* 358 Md. 393, 403, 749 A.2d 774 (2000) (stating that the appellate court's "interpretation of [a] statute and the legislature's intent must be examined by looking to the statutory scheme in its entirety rather than segmenting the statute and analyzing only its individual parts").

Subsection (b) of § 16.4, read in the context of the entire section, advances the County Commissioners' interpretation of the subsection. Section 16.4 is entitled, "General Requirements," and reads in its entirety:

(a) Ownership: The tract of land to be approved for development as a PUD must be in single ownership with proof of that ownership submitted to the Planning Commission by no later than review and approval of the Final Development Plan. Application for a PUD may be filed either by the owner or by a person having a substantial contractual interest in the land.

(b) Location: PUDs shall be located within the Urban Growth Area or the Town Growth Areas in the A, RR, RS, RU, RM and HI–2 Districts. The specific site shall be located adjacent to adequate roadway facilities capable of serving existing traffic and the future traffic generated by the uses in the PUD.

(c) Utilities: All PUDs shall be served with public water and public sewer.

(d) Concept plans previously approved by the Planning Commission for planned residential development under the PR Article of this Ordinance shall be considered valid and shall not be constrained by time periods as specified in subsequent paragraphs. A public hearing is not required unless a major change is made by the developer to the Concept Plan; minor changes may be approved by the Planning Commission. Where there is a question about the degree of change being major or minor, the Planning Commission shall make that determination. All other provisions of Sections 16.5(a)3, 4 and 5 shall apply.

(Footnote omitted).

Nothing in § 16.4 places an affirmative duty on the County Commissioners to make specific findings concerning the adequacy of adjacent roads or water and sewer facilities during the re-zoning stage of the PUD review and approval process. Subsection (c), for example, simply declares that all PUD zones must be served by public water and public sewer facilities. Consistent with the title of the section, the requirements that a PUD be located next to adequate roadway facilities and be serviced by public water and sewer facilities are merely "general requirements."

We have also examined § 16.7, entitled, "Design Standards." That section provides a series of standards that "are intended to ensure that the PUD is compatible with neighboring properties and ... provides a quality living environment for its residents." Subsection (i) of that section is titled, "Traffic Circulation and Parking," and provides, in pertinent part, that "[e]xisting and planned streets and highways shall

be of sufficient capacity to serve existing traffic and all new traffic *when fully developed.*" (Emphasis added). Section 16.7, read together with § 16.4(b), confirms the County Commissioners' conclusion that the latter provision does *not* require their determination, at the re-zoning stage, that adjacent roads are currently capable of handling both existing traffic and the predicted future needs of the PUD.

This construction of § 16.4(b) also makes sense in light of § 1.2 of the APFO. Section 1.2 of the APFO provides that the purpose of the ordinance is to ensure "that public facilities and services needed to support new development shall be available *concurrently with* the impacts of such new developments." (Emphasis added).[9] It follows from the use of the word "concurrently," that public facilities, including roads, need not be available *in advance* of "the impacts of such new developments."

The County Commissioners recognized that appellants were understandably concerned with increased traffic resulting from the PUD. The County Commissioners also recognized, correctly, that such concerns can be and must be addressed by the Planning Commission at later stages of the PUD review and approval process. APFO § 3.4 provides:

New development not meeting the requirements for adequate public facilities contained within this Ordinance shall not be approved by the Planning Commission unless the developer reaches an agreement with the Board of County Commissioners for the purpose of ensuring the adequacy of public facilities[.]

And, APFO § 4.4 provides, in pertinent part:

Except as otherwise provided in this Ordinance, if an existing road is determined by the Planning Commission to be inadequate to accommodate the traffic flow projected to

---

9. A "new development" under the APFO "consists of new subdivisions and site plans for new construction received for approval by the [Planning Commission] after [December 1, 1990]. . . ." § 2.3.13. Appellants present no argument that Mr. Crampton's development plans would not constitute a "new development."

be generated from the new development when combined with existing traffic flow, the new development shall not be approved.

These provisions ensure that the Planning Commission does not approve new development if it will cause an existing road to be inadequate to handle traffic generated by that development, unless the developer first reaches an agreement with the County Commissioners to ensure the adequacy of the roadway facilities.

Appellants argue that, under *Annapolis Mkt. Place, LLC v. Parker*, 369 Md. 689, 802 A.2d 1029 (2002), "the benchmark of adequacy [is] defined such that, in order to be adequate, the facilities must be in existence or programmed for construction." From that premise, appellants argue that, in this case, adequacy of facilities must be resolved at the time of rezoning, and not deferred.

In *Parker*, the Court of Appeals interpreted specific provisions of the Anne Arundel County Code ("AACC"), provisions that are significantly different from the provisions of the zoning ordinance and APFO at issue in this case. The AACC mandated that " 'a rezoning may not be granted except on the basis of an affirmative finding that . . . transportation facilities . . . are either in existence or programmed for construction.' " 369 Md. at 693, 802 A.2d 1029. Annapolis Market Place, LLC ("AMP"), the property owner, filed an application with Anne Arundel County to rezone its property from residential classifications to a commercial classification. *Id.* at 697, 802 A.2d 1029. An Administrative Hearing Officer denied the application. *Id.* at 698, 802 A.2d 1029. AMP appealed the hearing officer's decision to the Anne Arundel County Board of Appeals ("Board of Appeals"). *Id.* The Board of Appeals granted the application, reasoning, *inter alia*, that public facilities were adequate to accommodate the uses permitted by the commercial zoning classification. *Id.* at 699, 802 A.2d 1029. With regard to transportation concerns, the Board of Appeals determined "that the accomplishment of [ ] proposed traffic

improvements is reasonably probable of fruition." *Id.* at 700, 802 A.2d 1029.

Neighboring property owners sought judicial review in the Circuit Court for Anne Arundel County. The circuit court reversed the Board of Appeals' decision. One of the grounds upon which the circuit court ruled was "that a developer's 'promises to make [traffic] improvements' did not satisfy the requirement of being either 'in existence or programmed for construction.'" *Id.* at 701–702, 802 A.2d 1029. AMP appealed the circuit court's decision to this Court. We affirmed, in an unreported opinion, and held, *inter alia,* that " 'the Board [of Appeals] erred, as a matter of law, in disregarding the plain language of the statute that requires that adequate facilities be "in existence or programmed for construction,' " the latter of which [we] found did not include a developer's promise." *Id.* at 702, 802 A.2d 1029.

The Court of Appeals affirmed. The Court interpreted AACC, Art. 3, § 2–105(a)(3), *id.* at 705, 802 A.2d 1029, focusing on the meaning of the phrase "programmed for construction," *id.* at 709, 802 A.2d 1029. As for the Board of Appeals' "consideration of the adequacy of roads," the Court held that the Board of Appeals should not have relied on *Greater Colesville, supra,* to determine that improvements to transportation facilities were reasonably probable of fruition in the foreseeable future. *Id.* at 717, 802 A.2d 1029. The Court declared that the Board of Appeals erred in noting "that 'improvements to transportation facilities w[ould] be required prior to approval of any subdivision of th[e] Property,' " because the Board of Appeals should have determined, as required by the AACC, "that adequate access roads ... were either in existence or programmed for construction." *Id.* at 718, 802 A.2d 1029. The Court held that, "[b]y its own terms, ... § 2–105(a)(3) excludes from consideration at zoning as an acceptable level of commitment facilities that are characterized merely as 'reasonably probable of fruition' and/or those the provision of which at the time of subdivision may be proffered by the developer." *Id.*

*Parker* is inapposite for the simple, yet dispositive reason that the AACC provisions at issue in *Parker* are different in material respect from § 16.4(b). The applicable Code provisions addressed in *Parker* mandated that the Anne Arundel County Board of Appeals determine that roadway improvements are "either in existence or programmed for construction," and therefore the "reasonably probable of fruition in the foreseeable future" test should not have applied. Section 16.4(b) does not mandate that, at the time of PUD re-zoning consideration, the County Commissioners must determine that improvements to adjacent roadways be "either in existence or programmed for construction."

We hold that the zoning ordinance and APFO, read together, do not require that the County Commissioners find, before approving the re-zoning of land to a PUD, that an adjacent roadway is currently adequate to handle both existing and future traffic. Instead, the statutory scheme as a whole mandates that the Planning Commission monitor adequacy of roadway facilities throughout the PUD review and approval process, and throughout the period of development.

### Issue 4: Applicability of the "reasonably probable of fruition in the foreseeable future" test

Appellants argue that the County Commissioners erred because they did not "require that infrastructure necessary to support the development contemplated in the proposed [PUD] be existing or reasonably probable of fruition in the foreseeable future." Referring to school facilities in particular, they argue that the County Commissioners should have employed "the reasonably probable of fruition in the foreseeable future" test, applied in, *e.g., Montgomery County v. Greater Colesville Citizens' Ass'n*, 70 Md.App. 374, 521 A.2d 770 (1987), before determining whether such facilities are adequate to support development of the PUD.[10]

---

10. Appellants also assert, without citation to authority and without developing the argument, that the County Commissioners "impermissibly delegated an essential zoning function to" the Planning Commission

Appellees respond that the PUD review and approval process outlined in § 16.5 "is much more time sensitive and definite than the 'reasonably probable of fruition in the foreseeable future' test," and that, together, the zoning ordinance and APFO take the place of that test.

*Greater Colesville, supra,* guides our analysis of these arguments. We therefore discuss the case in some detail.

In *Greater Colesville,* we reviewed a decision of the County Council for Montgomery County, sitting as the District Council ("the Council"), to re-zone land to a floating zone. 70 Md.App. at 376, 380–81, 521 A.2d 770. Of primary concern in the decision to re-zone was the capacity of an intersection near the property to handle traffic generated by the development. *Id.* at 377, 521 A.2d 770. A hearing examiner concluded that the applicant's proposed improvements to the intersection "would render the intersection adequate" to support traffic generated by the project, and that those "improvements were reasonably probable of accomplishment within the foreseeable future[.]" *Id.* at 379, 521 A.2d 770.

The Council agreed with the hearing examiner and approved the re-zoning. *Id.* at 380, 521 A.2d 770. The circuit court reversed the Council's decision. *Id.* at 380, 521 A.2d 770. We reversed the circuit court. *Id.* at 391, 521 A.2d 770.

The issue we decided was whether the Council's findings on the traffic issue were "fairly debatable." *Id.* at 384, 521 A.2d 770. We recognized that resolution of that issue was determined by "whether the improvements proposed to be made in the traffic system are reasonably probable of fruition in the foreseeable future." *Id.* at 384, 521 A.2d 770.

We reviewed the zoning scheme in Montgomery County. That scheme required an applicant to submit a development plan to a planning board. The planning board, a hearing

when they left to the Planning Commission the determination of the PUD's "compatibility" with the surrounding neighborhood. We shall not make the argument for them, and decline to address the issue. *See Honeycutt v. Honeycutt,* 150 Md.App. 604, 618, 822 A.2d 551, *cert. denied,* 376 Md. 544, 831 A.2d 4 (2003).

examiner, and the Council were required to review the plan. Then, if re-zoning is granted, no construction could occur until the planning board, after a public hearing, approved a site plan. *Id.* at 386–87, 521 A.2d 770.

We said that "[t]he 'reasonably probable of fruition in the foreseeable future' test is functionally a mechanism for gauging the likelihood of premature development and, thereby, to avoid it." *Id.* at 387, 521 A.2d 770. That test, therefore, "necessarily involves assessing the probability that actions required to be done in the future will, in fact, occur." *Id.*

We concluded in *Greater Colesville* that the zoning ordinance at issue, like the "reasonable probable of fruition in the foreseeable future" test, is "a mechanism for controlling premature development." *Id.* at 389, 521 A.2d 770. We took into account the requirement in the zoning ordinance "of development in compliance with an approved development plan and its post zoning controls," which permits the development to be phased in conformance "with the accomplishment of required improvements or services." *Id.* Indeed, the zoning ordinance at issue in *Greater Colesville* is "more flexible, as well as more effective than the 'reasonably probable of fruition' test." *Id.* Therefore, "[w]hen that test is applied in the context of this ordinance not only is the timing of required improvements controlled, but because no development may be undertaken unless and until the required improvements have been made, the order of their completion vis-vis commencement of the approved development is controlled as well." *Id.* As a result, "under this zoning scheme, improvements that are reasonably probable of fruition in the foreseeable future become reasonably certain of fruition." *Id.*

 We turn now to ascertain whether the Washington County zoning scheme, provided by the zoning ordinance and APFO, like the Montgomery County scheme, is more flexible, as well as more effective, than the "reasonably probable of fruition in the foreseeable future" test.

In order to obtain PUD rezoning approval in Washington County, a developer is required to submit a "Concept Plan" to

the County Commissioners and the Planning Commission. *See* § 16.5(a). The concept plan must "reflect the actual development to be designed and constructed within a reasonable time frame." *Id.* If the developer does not submit the concept plan or does not commence construction in accordance with the timing provisions of the zoning ordinance, the zoning classification of the PUD will automatically revert to the original zoning classification. *Id.*

During the review process, the Planning Commission and the developer exchange information concerning, *inter alia*, the density and layout of the PUD development. *See* § 16.5(a)1. At this stage, the Planning Commission must consider, and "make findings of fact concerning, at a minimum, the impact of the proposed development on adjacent properties, the availability of public facilities, the impact of the proposed development on public roadways, the impact on public schools, fire and police protection, and the availability of adequate open space." § 16.7(a).

Next, a joint public hearing is held before the County Commissioners and the Planning Commission. The Planning Commission must submit to the County Commissioners its recommendation concerning whether to re-zone the property. If the County Commissioners approve the re-zoning to PUD, such "[z]oning approval constitutes tentative approval of density and design features as shown on the Concept Plan." § 16.5(a)2.

Even after zoning approval is obtained, the developer is required to submit a "Preliminary Development Plan" to the Planning Commission within six months of the zoning approval, with an extension of time allowed only for a good cause finding by the Planning Commission. At this stage, the Planning Commission may either approve or disapprove the Preliminary Development Plan. *See* § 16.5(a)3.

If the Planning Commission approves the Preliminary Development Plan, the developer must then submit a "Final Development Plan" for approval. If the Planning Commission approves the Final Development Plan, *see* § 16.5(a)4., the

developer must then "submit a Site Plan ... for the entire PUD or for any phase for [Planning] Commission review ...." § 16.5(a)5. The Planning Commission must approve or disapprove the Site Plan. *Id.*[11]

Each of these steps requires the Planning Commission to make decisions that involve administration of the APFO. *See* APFO § 3.1 (providing, in part, that the APFO "shall be administered by the Planning Commission"). The APFO provides that the Planning Commission may not approve any new development that does not meet the requirements of the APFO, "unless the developer reaches an agreement with the [County Commissioners] for the purpose of advancing the adequacy of public facilities[.]" *See* § 3.4.

Section 1.2 of the APFO is titled "Purpose," and provides that the APFO's purpose is to ensure

> that public facilities and services needed to support new development shall be available concurrently with the impacts of such new developments. In meeting this purpose, public facility and service availability shall be deemed sufficient if the public facilities and services for new development are phased, or the new development is phased, so that the public facilities and those related services which are deemed necessary by the local government to operate the facilities necessitated by that new development, are available concurrently with the impacts of the new development.

The zoning ordinance and APFO, in conjunction, require that development of a PUD comply with an approved site plan, together with post re-zoning approvals administered by the Planning Commission. The zoning ordinance and APFO permit such development to be phased commensurate with establishment of adequate public facilities, for the purpose of controlling premature development.

---

11. We note that § 25.4 provides that "[a]n appeal to the [Washington County] Board [of Appeals] may be taken by any person aggrieved ... by any decision of the [Planning Commission.]"

We conclude that the PUD rezoning scheme in Washington County, like the scheme at issue in *Greater Colesville,* is more flexible and more effective than the reasonably probable of fruition in the foreseeable future test. Indeed, in Washington County, development of a PUD, or any phase of a PUD, may not begin until the Planning Commission is satisfied that the required improvements to public facilities are made. We conclude, as we did in *Greater Colesville,* that under the zoning scheme we consider, "improvements that are reasonably probable of fruition in the foreseeable future become reasonably certain of fruition." *See id.*

Given the zoning scheme, the County Commissioners did not err when they decided that they did not "have to address infrastructure issues" at the re-zoning approval stage of the PUD review and approval process, unless those infrastructure issues "appear to be highly unsolvable." The County Commissioners correctly recognized that development controls are in place in the zoning ordinance and APFO that permit the County Commissioners to make findings regarding adequacy of public facilities at the zoning approval stage, but leave to the Planning Commission the duty of handling the details related to the adequacy of those facilities, in accordance with the zoning ordinance and APFO.[12]

---

**12.** In a footnote, appellants bring to our attention the County Commissioners' findings concerning adequacy of public school facilities to handle any increased enrollment brought about by the uses in the PUD. At the time the County Commissioners made their decision, the APFO provided that student enrollment at public schools not exceed 105% of the state-rated student enrollment capacity of the school. Also at that time, the County Commissioners used data from a June, 2002 enrollment report concerning the number of students enrolled at the public schools that would be effected by development of the PUD. Since that time, the APFO has been amended. It now provides, with regard to public elementary schools in Washington County, that enrollment may not exceed 85% of the state-rated student enrollment capacity. *See* APFO § 5.4.1(a).

Relying on the proposition that we apply the law in effect at the time we make our decision, appellants ask us to hold that the increased number of students that is projected to be caused by development of the PUD would violate the 85% provision of APFO § 5.4.1(a). This we cannot do. The effect of the change in capacity contemplated by the

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

APFO is a matter for the administrative agency to decide in the first instance. The Planning Commission, therefore, should consider the revised APFO when it considers whether to approve subsequent plans during the PUD plan and approval process.